(No. 12745.—Reversed, with judgment here.)

## THE BOWMAN & BULL COMPANY, Appellant, *vs.* THE POSTAL TELEGRAPH-CABLE COMPANY, Appellee.

*Opinion filed October 27, 1919—Rehearing denied Dec. 4, 1919.*

1. TELEGRAPH COMPANIES—*telegraph company cannot limit its liability for negligence in transmission of message.* A telegraph company cannot limit its liability for negligence in the transmission of a telegram by requiring a patron to write his message upon a blank bearing a condition exonerating the company from liability for an incorrect transmission unless the message is repeated at an additional cost to the sender or unless it is insured at an impossible rate, but such restrictions must be confined to mistakes due to infirmities of telegraphy which are unavoidable.

2. SAME—*burden is on company to show how mistake in transmission occurred.* In an action against a telegraph company for damages caused by the erroneous transmission of a telegram, if the plaintiff has proved the inaccuracy of the message the burden is on the company to show how the mistake occurred.

3. SAME—*company must transmit message as delivered to it.* A telegraph company is a public institution and is bound by law to serve all who apply, and when it receives a message upon which the tariff has been paid by the sender it is the duty of the company to transmit the message as delivered to it.

4. SAME—*the Carmack amendment does not apply to telegraph companies.* The Carmack amendment to the Inter-State Commerce act, concerning the liability of inter-State carriers for negligence, deals only with the shipment of property and does not apply to the transmission of messages by telegraph.

5. SAME—*amendment of 1910 to Inter-State Commerce act does not affect liability of telegraph companies for negligence in sending messages.* The amendment of 1910 to section 1 of the Inter-State Commerce act, including telegraph and telephone companies within the provisions of the act and allowing different rates for different classes of service, deals purely with rate-making, and makes no provision with respect to the liability of such carriers for their own negligence in the transmission of messages.

6. SAME—*liability of company for negligence in transmission of inter-State telegram is a question of State law.* Neither the commerce clause of the Federal constitution nor the Inter-State Commerce act renders inoperative the common law or State statutory regulations which are in aid of inter-State commerce and not in

interference therewith, and as Congress has not legislated in regard to the liability of telegraph companies for their negligence in the delivery of inter-State telegrams, such liability is controlled by the common or statute law of the State in which the service is rendered.

APPEAL from the First Branch Appellate Court for the First District;—heard in that court on appeal from the Municipal Court of Chicago; the Hon. SAMUEL H. TRUDE, Judge, presiding.

WILKERSON, CASSELS & POTTER, and SHERIFF, GILBERT & KRIMBILL, (BARRY GILBERT, of counsel,) for appellant.

JACOB E. DITTUS, for appellee.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

February 8, 1913, the appellant, at Chicago, Illinois, delivered to appellee for transmission from Chicago to Columbus, Ohio, the following telegram:

*"Columbus Butter Co., Columbus, Ohio:*

"Offer car fresh eggs good stock from good reliable packer now in transit due here Monday at twenty-three f. o. b. Chicago immediate wired acceptance.

BOWMAN & BULL COMPANY."

This telegram was written on a blank form of appellee, on the face of which were printed the words: "Send the following message, without repeating, subject to the terms and conditions printed on the back hereof, which are hereby agreed to." On the back of the blank the following printed matter appeared:

"THE POSTAL TELEGRAPH-CABLE COMPANY (Incorporated) Transmits and delivers the within message subject to the following terms and conditions:

"To guard against mistakes or delays the sender of a message should order it repeated,—that is, telegraphed back to the originating office for comparison. For this, one-half the regular rate is charged in addition. It is agreed between the sender of the message written on the face hereof and the Postal Telegraph-Cable Company that said company shall not be liable for mistakes or

delays in the transmission or delivery, or for non-delivery, of any unrepeated message beyond the amount received for sending the same, nor for mistakes or delays in the transmission or delivery, or for non-delivery, of any repeated message beyond fifty times the sum received for sending the same unless specially insured, nor in any case for delays arising from unavoidable interruption in the working of its lines, or for errors in cipher, or obscure messages. And this company is hereby made the agent of the sender, without liability, to forward any message over the lines of any other company when necessary to reach its destination.

"Correctness in the transmission of messages to any point on the lines of the company can be insured by contract in writing, stating agreed amount of risk and payment of premium thereon, at the following rates in addition to the usual charge for repeated messages, viz.:  one per cent for any distance not exceeding 1000 miles and two per cent for any greater distance.

"No responsibility regarding messages attaches to this company until the same are presented and accepted at one of its transmitting offices;  and if a message is sent to such office by one of this company's messengers he acts for that purpose as the agent of the sender.

"Messages will be delivered free within the established free delivery limits of the terminal office.  For delivery at a greater distance a special charge will be made to cover the cost of such delivery.

"This company shall not be liable for damages or statutory penalties in any case where the claim is not presented in writing within sixty days after the message is filed with the company for transmission.

"This is an unrepeated message and is transmitted and delivered, by request of the sender, under the conditions named above. Errors can be guarded against only by repeating message back to the sending station for comparison.

"The above terms and conditions shall be binding upon the receiver as well as the sender of this message.  No employee of this company is authorized to vary the foregoing.

> CHARLES C. ADAMS, *Second Vice-Prest.*
> CLARENCE H. MACKAY, *President.*
> EDWARD J. NALLY, *Vice-Prest. and Gen. Man.*
> CHARLES P. BRUCH, *Third Vice-Prest.*"

Appellee's sending operator at Chicago placed the number "24" in the upper right-hand corner of the blank to indicate the number of words in the text of the telegram. The rate for sending such a message unrepeated was sixty-three cents, which amount was charged to the account of

appellant.   The message was forwarded over appellee's lines
to its main office at Columbus, Ohio, and from there to a
branch office of the company in Columbus.   In this latter
transmission the telegram was so changed that when it was
delivered to the Columbus Butter Company it read:

"30 D jo 23 Fy. Chicago, Ill., 8-13.
*"Columbus Butter Co., Columbus, O.:*

"Offer car fresh eggs good stock from good reliable packer now
in transit due here Monday at twenty f. o. b. Chicago immediate
wire acceptance.

BOWMAN BULL CO."

Upon receipt of this message the Columbus Butter Com-
pany at once wired appellant, over appellee's lines, accepting
the offer, without repeating the price.   Appellant shipped
the car thus sold, and February 10 drew its draft on the
Columbus Butter Company for $2760, being the price for
the car-load of eggs at twenty-three cents a dozen.   This
draft the Columbus Butter Company refused to pay, on the
ground that it had in good faith accepted an offer for eggs
at twenty cents a dozen.   February 12 appellant first learned
of this position of the butter company and of the mistakes
in the transmission of the telegram, by which time the eggs
had been received at Pittsburgh, Pennsylvania, to which
place the Columbus Butter Company had ordered them
shipped.   The Columbus Butter Company subsequently sent
the appellant its check for $2400 in full settlement of its
obligation under the contract and the appellant accepted it.
The market price of eggs in Chicago February 8, 1913,
was twenty-three cents a dozen.   The check number "24"
put on the original message by appellee's sending operator
was intended as a check by which the number of words
in the message could be checked up by the receiving oper-
ator.   The figures "30 D jo 23" are a set of symbols show-
ing the office from which the message was sent, the operator
receiving same and the number of words in the message.
These symbols are the first part of the telegram which is
sent and received, and it is the duty of the receiving oper-

ator to check up the number of words in each message received by him to see that it corresponds to the check number.

The appellant brought suit to recover $360,—the difference between the value of the 12,000 dozen eggs at twenty-three cents and twenty cents. Appellee canceled the charge of sixty-three cents for sending the message, and claimed that was the extent of its liability under the terms and conditions under which it received the message. The case was tried by the court without a jury. The court found the Postal Telegraph-Cable Company not guilty in tort. Motions for a new trial and in arrest of judgment were made and overruled. From a judgment finding the Postal Telegraph-Cable Company not guilty, the Bowman & Bull Company took the case by appeal to the Appellate Court for the First District. That court affirmed the judgment of the municipal court and granted a certificate of importance, and the cause was brought to this court on appeal.

The question whether a telegraph company can limit its liability by requiring a patron to write his message upon a blank bearing a condition exonerating the company from liability for an incorrect transmission of the message unless repeated at an additional cost therefor to the sender was first considered by this court in *Tyler, Ullman & Co.* v. *Western Union Telegraph Co.* 60 Ill. 421. In a learned opinion by Mr. Justice Breese the authorities on this subject were reviewed, and this court there held that such restrictions, even if they be regarded as a contract, are unjust, without consideration and void. It was there said the telegraph company sought the patronage of the public in the exercise of its employment and assured the public that it would at least use ordinary care and diligence in its business, both as to the quality of its instruments and as to the skill of its operators. If the conditions relied upon were designed to shield the company from consequences flowing from want of skill of operators or insufficiency of instruments, which would be gross negligence, such a condition

would be contrary to public policy and void. The patron having proved the inaccuracy of the message, the company, to exonerate itself, must show how the mistake occurred. Such proof is not in the power of the patron but is in the power of the company. In the absence of such proof, want of ordinary care on the part of the company may be presumed. The company cannot by such terms and conditions relieve itself from liability for defective instruments and unskillful operators, for the company is bound by its obligations to the public to provide operators of sufficient skill and intelligence and instruments of the most approved construction. A telegraph company cannot in this manner protect itself from losses and damage occasioned by causes wholly within its own control. Such restrictions must be confined to mistakes due to the infirmities of telegraphy which are unavoidable. When the company receives a message for transmission it is bound to send the message correctly. Modern telegraphy is not now an infant art. For three-quarters of a century man has made subservient to his will this most subtle element of nature and by its mysterious potency has conveyed his messages to the farthest limit of civilization. Even in its infancy telegraphy scarcely ever failed to perform its office. For seventy-five years man has improved this wonderful art and has developed a skill almost perfect in his operation of telegraphic instruments, so there is no reason, the atmosphere being right, why a skilled operator with the proper instruments cannot send a message correctly. This being so, there is no reason for excusing the negligence and carelessness of those who undertake to transmit messages by telegraph. Telegraph companies are bound by law to serve all who apply. They are public institutions established by public law, to whom is granted the right of eminent domain. Their property is protected by the police power of the State. When a telegraph company receives a message and the tariff fixed by the company for transmission of this message is paid by

the sender it is the duty of the company to transmit the
message as delivered. A condition requiring repetition is
without consideration and does not restrict the company's
liability. Such a condition is an unfair imposition upon the
public, ·which is compelled to resort to this agency in the
transaction of its business. If, when a patron uses one of
the company's blanks bearing these conditions, it can be said
that he enters into a contract with the company restricting
its liability, then the patron entering into it is under a spe-
cies of moral duress. His necessity compels him to resort
to the telegraph as the only means by which he can speedily
transact the business in hand, yet he is compelled to submit
to such conditions as the company may impose and sign such
a paper as the company may present. The company is not
authorized to impose such regulations as shall deprive a
party of the use of its instrumentality save by coming un-
der the most onerous and unjust conditions. After repeat-
ing a message and paying the additional fifty per cent ex-
acted by the terms printed on the blank, the sender cannot
then recover of the company to the extent of his loss but
is limited to an amount fifty times the sum paid for sending
the message,—in the case at bar, $31.50. Such a contract
forced upon the sender is unjust, unconscionable, without
consideration and utterly void. This same case was further
considered in *Western Union Telegraph Co.* v. *Tyler*, 74
Ill. 168, where the rule was re-affirmed that the usual regu-
lations exempting a telegraph company from liability for
errors in unrepeated messages exempt it only for errors aris-
ing from causes beyond its own control, and that, the in-
accuracy of the message being proved, the burden of reliev-
ing itself from the presumption of negligence thereby raised
rests upon the company. This court there said that it is
apparent the additional fifty per cent exacted for repeating
the message is to increase the revenue of the company. For
the established rates the company engages to use all proper
skill and care in transmitting messages over its wires. The

290—11

duty at once arises, the charges being paid, to transmit this message as delivered. The undertaking of the company is *prima facie* to send it correctly, and if its wires and instruments are in proper order and its operators skillful and careful the message will traverse the wires precisely in the words and figures which composed it when placed upon the wires and is sure in that shape and form to reach its destination, no atmospheric causes intervening to prevent. The very fact that but few cases of negligence have been brought against telegraph companies for failure to transmit messages correctly is strong proof that they do in almost all cases transmit messages correctly, and that they can always do so if proper care is taken and the requisite skill and proper instruments are used. There would then be no need for repeating a message, and such a requirement must be regarded as a contrivance to swell their receipts.

The doctrine laid down in the above cases has been approved in *Webbe* v. *Western Union Telegraph Co.* 169 Ill. 610, *Providence-Washington Ins. Co.* v. *Western Union Telegraph Co.* 247 id. 84, and *Beggs* v. *Postal Telegraph-Cable Co.* 258 id. 238. An undoubted numerical majority of the States of this Union have declared the rule laid down by this court to be the correct one, and hold the terms and conditions imposed by the telegraph company, heretofore set forth in this opinion, to be a mere device by the company to evade liability for the consequences of its own negligence and therefore contrary to public policy and void. (37 Cyc. 1685; 27 Am. & Eng. Ency. of Law,—2d ed.—1043.)

The holding in these cases is the declared policy of this State and will control in the instant case, unless, as contended by appellee, the field of liability for negligence of telegraph companies with respect to interstate messages has been taken over by the Federal government. It contends that its liability in this case is controlled by the Interstate Commerce act and the Federal law, to the exclusion of the State law, by reason of the fact that by the amendment of

June 18, 1910, to the Interstate Commerce act the provisions of that act were made to apply to telegraph companies and their contracts for the transmission of interstate messages. The holdings of the State courts of this Union are in hopeless conflict on this point and we make no effort to harmonize the decisions. The United States Supreme Court has not passed on the question since the amendment of 1910 became effective, and so its decisions are not necessarily conclusive here. Appellee relies upon *Primrose* v. *Western Union Telegraph Co.* 154 U. S. 1, decided in 1893, but that decision rested upon the holding in the same case that a telegraph company was not a common carrier. The act relied upon by appellee now specifically declares that telegraph companies "shall be considered and held to be common carriers within the meaning and purpose of this act."

In *Pennsylvania Railroad Co.* v. *Hughes,* 191 U. S. 477, it was held that the highest court of a State may administer the common law according to its own understanding and interpretation without liability to a review in the Federal Supreme Court, unless some right, title, immunity or privilege, the creation of the Federal power, has been asserted and denied, and that the refusal of a State court to limit the liability of a common carrier for its negligence in the execution of a contract for interstate carriage to the valuation agreed upon is not an unlawful regulation of interstate commerce, in the absence of congressional action providing a measure of liability different from that established by the settled law of the State.

Congress has the unqualified right to legislate concerning interstate commerce. In the exercise of this right Congress passed the first interstate commerce act in 1887. It was confined to interstate carriers of goods and related to rates, regulations, classifications and rules of such carriers but said nothing specifically about liability of such carriers for their negligence. So, while the subjects of rates, regulations, classifications and rules applying to interstate car-

riers of goods thereby passed out of State control, questions concerning liability of such carriers of goods for their negligence did not but still remained within the purview of State regulation. In 1906 Congress by the passage of the Carmack amendment (act of June 29, 1906, U. S. Comp. Stat. sec. 8604a,) took over the field of liability of interstate carriers of goods. (*Adams Express Co.* v. *Croninger,* 226 U. S. 491.) Prior to the enactment of the Carmack amendment Congress had not dealt with the rights of carriers to limit by contract their liability for injuries occurring in interstate transportation, and consequently the States were free to establish their own laws and policies and apply them to such contracts. The Carmack amendment deals only with the shipment of property. It is clear that Congress did not intend by that act to deal with transportation of persons by railroad or of messages by telegraph. *Chicago, Rock Island and Pacific Railway Co.* v. *Maucher,* 39 Sup. Ct. Rep. 108.

In discussing the scope of the Carmack amendment the Federal Supreme Court in *Missouri, Kansas and Texas Railway Co.* v. *Harris,* 234 U. S. 412, said: "It is, of course, settled, that when Congress has exerted its paramount legislative authority over a particular subject of interstate commerce State laws upon the same subject are superseded. [Citing cases.] But it is equally well settled that the mere creation of the Interstate Commerce Commission, and the grant to it of a measure of control over interstate commerce, does not, of itself, and in the absence of specific action by the commission or by Congress itself, interfere with the authority of the States to establish regulations conducive to the welfare and convenience of their citizens, even though interstate commerce be thereby incidentally affected, so long as it be not directly burdened or interfered with. * * * These cases recognize the established rule that a State law enacted under any of the reserved powers,—especially if under the police power,—is not to be set

aside as inconsistent with an act of Congress unless there is actual repugnancy, or unless Congress has at least manifested a purpose to exercise its paramount authority over the subject." And the same rule applies to the declared common law of the State.

Interstate common carriers of messages are now in the same situation that interstate common carriers of goods were after the passage of the Interstate Commerce act and prior to the Carmack amendment. Before this amendment the Interstate Commerce act did not take over from the States the field of liability for negligence of interstate carriers of goods. Prior to 1910 Congress had passed no regulatory statutes concerning telegraph companies. In that year it amended section 1 of the Interstate Commerce act, so that, so far as it refers to telegraph companies, it reads as follows: "The provisions of this act shall apply * * * to telegraph, telephone and cable companies engaged in sending messages from one State, Territory or district of the United States to any other State, Territory or district of the United States, or to any foreign country, who shall be considered and held to be common carriers within the meaning and purpose of this act. * * * All charges made for any service rendered or to be rendered * * * for the transmission of messages by telegraph, telephone or cable, as aforesaid, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service, or any part thereof, is prohibited and declared to be unlawful: *Provided,* that messages by telegraph, telephone or cable, subject to the provisions of this act, may be classified into day, night, repeated, unrepeated, letter, commercial, press, government, and such other classes as are just and reasonable, and different rates may be charged for the different classes of messages." (U. S. Comp. Stat. 1916, sec. 8563.)

This proviso, which gives the telegraph companies the right to have different classes of messages and to charge

different rates for the different classes of service, clearly makes no provision with respect to liability of such carriers for their own negligence. It deals purely with rate-making. Carriers of goods are likewise permitted by the act to charge different rates for different classes of service. For instance, fresh fruits move in one class and clay in another. So a car-load shipper receives on most commodities a lower rate than does a less than car-load shipper; and, likewise, the rate on perishable products shipped from west to east in refrigerator cars is higher than the rate charged for shipment of non-perishable goods in other cars, partly because such cars must generally be carried back to the west empty. This empty-haul return is taken into consideration in fixing the rates on commodities moving in refrigerator cars, and corresponds, to a degree, with the additional rate for repeating a message. The authority to establish different rates for different classes of service does not affect the liability for negligence of interstate carriers of goods, nor does it affect the liability for negligence of interstate telegraphic carriers of messages.

The essential difference between repeated and unrepeated messages is the difference in labor and in the nature of the service obtained. The additional rate for repeated messages is allowed to cover the added cost of repeating the message and added service rendered the patron. Prior to 1910 this distinction between repeated and unrepeated messages was the one made by the telegraph companies in establishing their rates in all those States where there was unlimited liability on both classes of messages. If it had been the intention of Congress to take over the field of liability for negligence by failure to correctly deliver telegraphic messages it would have done so in clear and unmistakable terms and would likely have recognized the rule of liability already established in six-sevenths of the States of the Union. Congress has consistently declined to grant exemption from liability to common carriers for their neg-

ligence, and unless it is clear that Congress, by placing tele-
graph companies under the Interstate Commerce act, meant
thereby to set aside the declared policy of the great major-
ity of the States, and so permit telegraph companies to ex-
empt themselves from liability for their own negligence,
such a purpose should not be read into the act.

To lay down a rule of law that telegraph companies may
limit their liability for failure to correctly deliver a message
on account of their own negligence would encourage the
employment of incompetent help and the use of imperfect
instruments, and thereby render this instrumentality of in-
terstate commerce almost valueless as a safe means of com-
munication. Commercial telegraph messages frequently in-
volve large sums of money, and are intended to, and do,
create obligations and induce action. The telegraph has
become a necessity in the commercial life of the nation.
There is no reason, economic or otherwise, why this great
mass of messages should move at the risk of the sender.
Assuming the amount in the instant case to be $23,000 in-
stead of twenty-three cents, the error caused by the negli-
gence of the telegraph company would then have amounted
to $3000 on one item, and on 12,000 items would have
amounted to $36,000,000. The telegraph company by its
contract says that the sender can protect himself by having
the message repeated. Assuming the patron sends such a
message repeated and the error occurs, he can recover, ac-
cording to its rules, fifty times the amount for sending the
same,—in this case $31.50. The utter fallacy of the argu-
ment of permitting the telegraph company to relieve itself
of liability for its own negligence in failing to correctly
deliver such a message is shown by this illustration. The
company further states that if the sender is not satisfied
with its unrepeated or repeated service he can insure the
message. The Interstate Commerce act does not say any-
thing about authorizing the telegraph company to insure its
messages and thereby protect itself from liability for fail-

ure to deliver. We need only apply the terms of its contract for insurance to see how ridiculous that provision is. The rate charged is two per cent on the agreed amount of risk. For what amount shall the sender insure his message? How does he know what error the telegraph company is liable to make? In the instant case the patron might by chance have guessed that the telegraph company would commit the error it did commit; then the message could have been insured for $360, and the charge for the insurance would have been $7.20. But how could the sender know that the telegraph company would not omit the word "twenty" instead of the word "three?" In order to protect itself against such a possibility it would have had to insure its message for $2400, and the rate would have been $48. The insured rate is clearly impossible to apply and is prohibitive, and is meant to be. The recovery on a repeated message is wholly inadequate on a transaction of any size. And again, is there any possible reason why a telegraph company should be able to exempt itself from liability for its own negligence? No other person in the land has this privilege. A common carrier of goods does not have it, and why should a common carrier of telegraphic messages? The courts of last resort of all but six States of the United States have declared that public policy opposes any such limitation of liability. Congress put telegraph companies under the act for the purpose of controlling them, and not for the purpose of relieving them from liability for their own negligence.

Section 8 of the Interstate Commerce act (Act of February 4, 1887, U. S. Comp. Stat. 1916, sec. 8572,) gives a right of action against a common carrier for damages occasioned by its doing an act prohibited by the statute, and section 9 of the act (Ibid. sec. 8573) grants the right of choice between complaint to the Interstate Commerce Commission by persons claiming to be damaged by any common carrier subject to the provisions of the act, and a suit in a

Federal court for the recovery of the damages for which such common carrier may be liable under the provisions of the act. Sections 8 and 9, standing alone, might be construed to give the Federal courts exclusive jurisdiction of all suits for damages occasioned by the carrier's violating any of the old duties which were preserved and the new obligations which were imposed by the Commerce act. Evidently for the purpose of preventing such a result the proviso to section 22 of the act (Ibid. sec. 8595) declares that "nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies." That proviso was added to preserve all existing rights which were not inconsistent with those created by the statute, and to preserve existing remedies, such as those by which a shipper could recover in a State court for damages to property while in the hands of the interstate carrier, damages caused by delay in shipment, damages caused by failure to comply with its common law duties, and the like. But for this proviso to section 22 it might have been claimed that, Congress having entered the field, the whole subject of liability of a carrier to shippers in interstate commerce had been withdrawn from the jurisdiction of the State courts, and this clause was added to indicate that the Interstate Commerce act, in giving rights of action in Federal courts, was not intended to deprive the State courts of their general and concurrent jurisdiction. *Pennsylvania Railroad Co.* v. *Puritan Coal Mining Co.* 237 U. S. 121; *Pennsylvania Railroad Co.* v. *Sonman Shaft Coal Co.* 242 id. 120.

In *Western Union Telegraph Co.* v. *Crovo*, 220 U. S. 364, it was held that a Virginia statute under which a penalty is incurred by a telegraph company that negligently fails to transmit within the State as promptly as practicable a message received at an office in the State for transmission to a person in another State, is a valid exercise of the power of the State, in the absence of any legislation of

Congress on the subject. It would thus appear that the Federal Supreme Court recognizes that Congress has not taken over the field of liability of telegraph companies for their negligence.

In *Chicago, Milwaukee and St. Paul Railway Co.* v. *Solan,* 169 U. S. 133, it was held that an Iowa statute providing that no contract or regulation shall exempt any corporation carrying persons or property by rail from its liability as a common carrier is not void as an attempt to regulate interstate commerce, as applied to a contract of interstate transportation whereby the carrier attempted to limit its liability for personal injuries resulting from negligence of its servants to the sum of $500, the court saying: "By the law of this country as declared by this court, in the absence of any statute controlling the subject, any contract by which a common carrier of goods or passengers undertakes to exempt himself from all responsibility for loss or damage arising from the negligence of himself or his servants is void as against public policy, as attempting to put off the essential duties resting upon every public carrier by virtue of his employment, and as tending to defeat the fundamental principle on which the law of common carriers was established,—the securing of the utmost care and diligence in the performance of their important duties to the public. * * * The rules prescribed for the construction of railroads and for their management and operation, designed to protect persons and property otherwise endangered by their use, are strictly within the scope of the local law. They are not in themselves regulations of interstate commerce, although they control in some degree the conduct and liability of those engaged in such commerce. So long as Congress has not legislated upon the particular subject they are rather to be regarded as legislation in aid of such commerce and as a rightful exercise of the police power of the State to regulate the relative rights and duties of all persons and corporations within its limits. * * *

The statute now in question, so far as it concerns liability for injuries happening within the State of Iowa, * * * clearly comes within the same principles. It is in no just sense a regulation of commerce. It does not undertake to impose any tax upon the company or to restrict the persons or things to be carried or to regulate the rate of tolls, fares or freight. Its whole object and effect are to make it more sure that railroad companies shall perform the duty resting upon them by virtue of their employment as common carriers, to use the utmost care and diligence in the transportation of passengers and goods."

Neither the commerce clause of the United States constitution nor the fact that Congress has power to make provisions regulating interstate common carriers, including telegraph companies, renders invalid a State statute regulating the delivery of interstate telegrams until Congress has acted and by such action covered the specific matters governed by the State statute. *Western Union Telegraph Co.* v. *Boegli,* (Ind.) 115 N. E. Rep. 773; *Western Union Telegraph Co.* v. *James,* 162 U. S. 650.

In *Commercial Milling Co.* v. *Western Union Telegraph Co.* 151 Mich. 425, it was held that a statute making a telegraph company liable for negligence to the amount of loss sustained does not attempt to state, measure or define any duty of the telegraph company or to establish, define or fix the consequence of its miscarriage, but the liability is established without reference to that act, and it is when the company asks to be discharged therefrom by giving effect to a stipulation limiting liability for an unrepeated message to the amount received for its transmission that the act becomes at all effective, and hence to apply the act to an interstate message so as to constitute such a stipulation void and no limitation of the amount of liability is not to give the act extra-territorial effect and does not regulate interstate commerce in violation of the constitution of the United States. (Affirmed in 218 U. S. 406.)

In *Western Union Telegraph Co.* v. *Boegli, supra,* the Indiana Supreme Court holds that the Interstate Commerce act relates specifically to and provides a penalty for only such conduct as is the result of deliberation and intention and does not relate to mere neglect in individual cases provided against by statute or the common law. Congress has not prescribed by law that dispatches shall be diligently delivered, nor has it provided a penalty for negligence in delivery. Since Congress has not by the Interstate Commerce act specifically covered this feature of the service there is nothing to prevent the common or statute law of a State from regulating it. The Interstate Commerce act covers such administrative matters as the fixing of rates, the filing of regulations and the justness and reasonableness of the same, but does not exclusively cover negligent failure by carriers to comply with the regulations filed nor negligent performance of common law or statutory duties. Therefore the act does not render inoperative the common law or State statutory regulations, which are in aid of interstate commerce and not in interference therewith.

In *Western Union Telegraph Co.* v. *Bailey,* 108 Texas, 427, the court, discussing the amendment of June 18, 1910, said: "If this amendment was an exertion by Congress of its authority over the subject of the liability of telegraph companies for the negligent non-delivery of interstate messages, including that of their right to provide by contract that they should be exempt from such liability, or if it clearly manifested a purpose on the part of Congress to extend its authority over those subjects, the rules of the State upon them are, of course, superseded. But we do not regard the amendment as open to such construction. * * * There is no mention of the liability of such companies for negligence. That subject is not dealt with or touched upon. If it had been the purpose of Congress to legislate we think it would have done so in terms clear and unmistakable. We are not required to assume that such was the intention in

the absence of its clear manifestation.   The laws of a State, as they may be properly directed to the subjects of interstate commerce, are not to be held as inconsistent with an act of Congress unless they present an absolute conflict, or unless, at least, a purpose on the part of Congress to legislate upon the particular subject is clearly revealed.   As was said in *Missouri, Kansas and Texas Railroad Co.* v. *Harris,* 234 U. S. 419, 34 Sup. Ct. 793: 'This rule rests on fundamental grounds and should not be disregarded.' * * * The contrast between this legislation and that of Congress relating to the liability of interstate carriers of property very strongly indicates, we think, that the regulation of the liability for negligence of interstate telegraph companies was not in the mind of Congress.   In the latter [Carmack amendment] is found express and definite provision upon the subject, accompanied by an emphatic declaration. * * * These provisions of the Carmack amendment do not apply to telegraph companies. * * * That they do not apply to such companies * * * convinces us that Congress did not intend that the amendment of 1910 should embrace the subject."

In *DesArc Oil Mill* v. *Western Union Telegraph Co.* 132 Ark. 335, the court said: "Is such a stipulation rendered valid by the statute enacted by Congress in the year 1910, giving the Interstate Commerce Commission authority to regulate rates and prices of telegraph companies? We discover no good reason for holding that such a contract, if void under the general principles of common law prior to the enactment of that statute, has become valid under the statute.   The controlling clause of the statute in question reads as follows: 'All charges made for any service rendered or to be rendered in the transportation of passengers or property and for the transmission of messages by telegraph, telephone or cable, as aforesaid, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service, or any part

thereof, is prohibited and declared to be unlawful: *Provided,* that messages by telegraph, telephone or cable, subject to the provisions of this act, may be classified into day, night, repeated, unrepeated, letter, commercial, press, government, and such other classes as are just and reasonable, and different rates may be charged for the different classes of messages.' It was clearly the intention of Congress in enacting this statute to confer authority upon the commission merely to regulate rates and classification of messages, and not to confer authority to declare the principles of law affecting the liability of the carrier. The classification of repeated and unrepeated messages and the fixing of different rates for the different classes of messages is quite a different thing from a contract absolving the carrier from liability for its own negligence. If it had been intended to confer power upon the Interstate Commerce Commission to change the law in that respect,— the mere approval of classification of rates,—doubtless the framers of the statute would have used different language. The Supreme Court of the United States has given a very clear intimation that no such power is conferred by the various statutes with reference to the regulation of interstate rates by the commission. In *Adams Express Co.* v. *Croninger,* 226 U. S. 491, (33 Sup. Ct. 148,) the court said: 'That a common carrier cannot exempt itself from liability for its own negligence or that of its servants is elementary,' etc. * * * Nor can adherence to the common law principle which invalidated such a stipulation be viewed as a burden upon or interference with interstate commerce or as being in conflict with the authority of the Interstate Commerce Commission over that subject, for, as before stated, the exemption does not come within the scope of the regulation of rates or of classification of messages, but is purely an attempt to contract against the general law of the land with respect to liability for negligence."

In *Dickerson* v. *Western Union Telegraph Co.* 114 Miss. 115, the court said: "The contention of appellee is, that by this provision Congress has taken charge of the telegraph and telephone business to the same extent that it has taken charge of common carriers of persons and property under the Carmack amendment. * * * It seems to us that the act of 1910 is no broader when applied to telegraph and telephone companies than the original act to regulate commerce prior to the Carmack amendment was to the railroads, and that the same rules would apply to the telegraph business under the present statute as applied to the railroads under the statute prior to the Carmack amendment."

Counsel for appellee cites many cases holding to the contrary. We have given careful consideration to those cases but cannot adopt the reasoning nor the views expressed therein. No good purpose could be served by discussing them, and so we will not further lengthen this opinion by an attempt to analyze the learned opinions of courts holding the view opposite the one we have adopted. Furthermore, we think the evidence here shows a degree of carelessness that amounts to gross negligence, and it is admitted that appellee would be liable for gross negligence. One who sends a message is entitled to have it transmitted, word for word and letter for letter, exactly as it is written. An operator is not entitled to take liberties with the message and guess that the changes which he consciously puts into it are of no importance. Each word as written may have a significance of which the operator is not informed. This message, as delivered, shows evidence of having been consciously altered. The signature attached to it was "Bowman & Bull Company." The signature to the message as delivered was "Bowman Bull Co." The word "wired" was changed to "wire." The dropping of the "d" made a difference in the meaning. As sent, the message meant that the car was offered subject to an immediate wired acceptance by the purchaser. As delivered it meant, "This is im-

mediate; wire your acceptance." It appears that the operator thought he was correcting the sender's poor grammar. As it happened, the change made very little difference, because the ideas are nearly the same, but the operator took a chance when he changed this word. Further evidence of willful tampering with the message is shown by the change in the check number. The message as delivered contained twenty-four words, and it was so indicated by the sending operator. In order to enable the receiving operator to know that he received all the words, this check number "24" is the first part of the message sent out. One of two things happened: either the check number was received as "23" and twenty-three words were sent, or the check number was received as "24," and when twenty-three words came the receiving operator willfully omitted to call back to get the missing word but changed his check number to "23." It is hardly probable that such a coincidence could have happened as that the check number was transmitted over the wire incorrectly and then the message was transmitted in such a way as to correspond with the incorrect check number. Gross negligence is a difficult thing to prove, but here the errors in transmission were wholesale. Five changes were made in the transmission of a short message. Such negligence cannot be excused.

In *Redington* v. *Pacific Postal Telegraph-Cable Co.* 107 Cal. 317, action was brought against the telegraph company for failure to correctly transmit an unrepeated message. It appeared that the plaintiff delivered to defendant a message directed to a sheriff requiring him to levy on property in the amount of "nineteen hundred three dollars." In sending the message the company omitted the syllable "teen" in the first word, making it read "nine" instead of "nineteen." The message blanks of the defendant in terms limited its responsibility to the cost of transmission unless the message was repeated. An expert telegraph operator gave it as his opinion that owing to a rest of from one to

three seconds which would occur between the first syllable of the word "nineteen" and the balance of the message if the current had ceased to flow, the omitted syllable could not have been lost without the receiving operator's knowledge if he was competent. It was there held that the evidence was sufficient to sustain a finding of gross negligence on the defendant's part, making it liable for the damage sustained.

We are impressed with the importance to the commercial world of a correct decision in this case, and after a careful review of the authorities we must hold, in accordance with the views herein expressed, that the Appellate Court erred in affirming the judgment of the municipal court. The judgments of the municipal and Appellate Courts are therefore reversed, and judgment is entered here against appellee and in favor of appellant for $360 and costs.

*Reversed, with judgment here.*