HALLIBURTON COMPANY, Plaintiff-Appellant, v. ROGER E. MARLEN, Defendant-Appellee.

Fifth District   No. 5—85—0432

Opinion filed April 8, 1987.

Don Cary Collins, of Belleville, for appellant.

Thomas A. LeChien, of LeChien & Associates, Ltd., of Belleville, for appellee.

JUSTICE KASSERMAN delivered the opinion of the court:

Plaintiff, Halliburton Company, has perfected this appeal from a judgment entered by the circuit court of St. Clair County in favor of defendant, Roger Marlen. The following facts appear in the record.

On March 20, 1981, plaintiff filed a complaint against defendant alleging that defendant was indebted to plaintiff in the amount of $9,000, plus interest, pursuant to a letter of guaranty. Specifically, it was alleged that defendant guaranteed payment for services and materials furnished by plaintiff to Sandrock Company, an Illinois corporation. On April 27, 1981, defendant filed an answer which did not assert an affirmative defense. However, an affirmative defense unsupported by a motion for leave to amend the answer was filed by defendant on September 30, 1981, alleging that defendant was entitled to a $14,960.10 setoff, this being the amount of damage wrongfully caused by plaintiff's employees to one of Sandrock's oil wells.

On March 8, 1985, the date of trial, plaintiff filed a motion to strike defendant's affirmative defense. This motion stated that the affirmative defense should be stricken because (1) defendant's answer did not contain an affirmative defense, (2) defendant failed to formally request the court's permission to file an affirmative defense, (3) defendant failed to give plaintiff notice of any hearing on whether defendant should be allowed to file an affirmative defense, (4) defendant did not file his affirmative defense within a reasonable time, and (5) the affirmative defense is not related to the subject matter of plaintiff's complaint. The circuit court granted defendant leave to file the affirmative defense instanter and denied plaintiff's motion to strike. The following evidence was admitted at trial.

On August 24, 1979, defendant signed a letter of guaranty in favor of plaintiff. This letter of guaranty provided that defendant would be primarily liable to plaintiff if Sandrock Company failed to pay plaintiff for services and materials extended to Sandrock pursuant to an open line of credit. The limit of defendant's guaranty was $10,000.

Through the end of 1979, plaintiff extended Sandrock $10,565.04 in services and materials pursuant to the open line of credit. Sandrock paid plaintiff this sum on January 18, 1980. During 1980, plaintiff extended Sandrock $9,000 in services and materials pursuant to the open line of credit. At the end of 1980 Sandrock's indebtedness to plaintiff including interest was $9,473.32.

In early 1981 Sandrock declared bankruptcy. On February 9, 1981, plaintiff filed a proof of claim in bankruptcy court alleging that Sandrock owed it $9,781.24. On February 10, 1983, the trustee in bankruptcy issued plaintiff a $2,763.22 payment, which was the final

distribution in Sandrock's chapter VII bankruptcy. Thus, plaintiff was seeking from defendant the difference between the bankruptcy settlement and Sandrock's $9,000 debt plus interest.

Defendant, who was formerly the chief operating officer of Sandrock, testified as follows regarding the affirmative defense. In 1979 Sandrock drilled several oil wells outside of Tilden, Illinois, at a location known as Canning Fields. In order to develop the Canning No. 2 well, Sandrock was required to drill through a sandstone formation which the Illinois Power Company used to store natural gas. In order to get Illinois Power's permission to develop the Canning No. 2 well, Sandrock was required to agree to seal, with cement, the sandstone formation from their drilling operation. Sandrock hired plaintiff to complete this work.

On November 21, 1979, defendant and an Illinois Power representative went to the site of the Canning No. 2 well to supervise plaintiff's work on this project. Defendant explained the procedure to be performed as follows: The hole drilled into the ground was 6⅞ inches in diameter and extended to a depth of approximately 2,100 feet. Inside of this hole was a long-string pipe, 4½ inches in diameter, which extended down the well into the "pay zone" (i.e., where the oil is expected to be located). Attached to the end of this pipe was a Baker open hole packer, which is used to seal the hole to the "pay zone" from any cement contamination. To get the rubber packer set to seal the hole, a metal ball is pumped with water down the long-string pipe into the end of the packer. The ports located above the packer set would then open, allowing the water to escape up the sides of the hole. Once circulation was established (i.e., water came flowing to the surface around the long-string pipe), cement would be pumped into the long-string pipe. Two hundred to four hundred pounds of pressure were required to circulate the cement. This would continue until the cement had circulated sufficiently to seal off the drill hole. After pumping all the cement into the pipe, water would be used to pump a wiper plug through the pipe to clean out the cement.

Since cement circulates slowly and hardens quickly, circulation of the cement must be kept constant. In order to maintain such circulation, a dual manifold system would be attached to the long-string pipe. The dual manifold system plaintiff brought to the site had one hose opening, two valves (one on top, one on bottom), a wiper plug, and a wiper plug release pin. During the water and cement circulation operations the top valve was to be closed and the bottom valve was to be open while the liquids were pumped into the hose opening. After pumping all of the cement into the pipe, the cleaning operation was to

begin. This was to be accomplished by simultaneously opening the top valve, closing the bottom valve, releasing the wiper plug release pin, and pumping in water so as to move the wiper plug down the pipe.

Defendant testified that on this occasion an employee of plaintiff's disconnected the hose immediately after pumping all of the cement into the pipe. This caused the cement to begin hardening in the pipe. After realizing his mistake, plaintiff's employee reconnected the hose, changed the valves and began pumping water into the pipe in order to force the wiper plug down the pipe. Since the cement had begun to harden, a large amount of pressure (approximately 2,000 pounds) was used in an attempt to force the wiper plug down the pipe. This amount of pressure caused the long-string pipe to rise 2 to 3 feet out of the ground, which in turn caused the packer to break loose, allowing cement to flow down into the "pay zone."

According to defendant, the net result of these events was that: (1) the packer was ruined, (2) the cement in the long-string pipe had to be drilled out, and (3) the well was rendered unproductive due to the cement in the "pay zone." Defendant alleged (1) that Sandrock's packer was worth $954, (2) that it cost Sandrock $10,464.45 to drill out the long-string pipe, and (3) that Sandrock's attempt at making the well productive again cost $3,559.65. Although defendant's affirmative defense claimed that he was entitled to a total setoff of $14,960.10 against the $10,000 guaranty, we compute this alleged total setoff to be $14,978.10. Defendant stated that the work performed to remedy plaintiff's alleged negligence was completed in May 1980 and that the well produced much less oil than anticipated. The record establishes that the allegedly negligent work performed by plaintiff was paid for on or about January 18, 1980.

After hearing this evidence, the trial court entered judgment for defendant and dismissed the cause. Plaintiff appeals, asserting (1) the same challenges to the affirmative defense alleged prior to trial, (2) that defendant waived the affirmative defense by paying plaintiff for the allegedly negligent work, and (3) alternatively, that the trial court's finding in defendant's favor was contrary to the manifest weight of the evidence.

■■ A defense is of an affirmative nature if, by the raising of it, a defendant gives color to his opponent's claim and then asserts new matter by which the apparent right is defeated. (*Zieger v. Manhattan Coffee Co.* (1983), 112 Ill. App. 3d 518, 533, 445 N.E.2d 844, 855.) The defendant in the instant case gave color to plaintiff's claim by admitting that he executed the letter of guaranty on behalf of Sandrock for plaintiff's benefit. Defendant then asserted new matter

(*i.e.*, plaintiff's allegedly negligent work) which could defeat, in whole or in part, plaintiff's claim for damages pursuant to the guaranty. We therefore conclude that the matter defendant raised against plaintiff's claim constituted an affirmative defense; consequently, plaintiff's argument that such matter did not constitute an affirmative defense is rejected.

■■ All pleadings shall be liberally construed with a view toward doing substantial justice between the parties. (Ill. Rev. Stat. 1985, ch. 110, par. 2—603(c).) In accordance with this principle, a trial court has broad discretion to allow amendments and supplements to pleadings. This discretion is not abused unless clearly arbitrary and without foundation. (*Murphy v. Murphy* (1975), 31 Ill. App. 3d 321, 338, 334 N.E.2d 779, 792.) The record indicates that approximately three years elapsed between the filing of the affirmative defense and trial. Plaintiff's brief does not allege, nor does the record show, that plaintiff suffered any prejudice as a result of the alleged late filing of the affirmative defense. Since plaintiff suffered no prejudice, we conclude that the trial court did not abuse its discretion in allowing the affirmative defense to be filed instanter before trial. See 31 Ill. App. 3d 321, 338, 334 N.E.2d 779, 792.

■■ ■ Plaintiff next asserts that defendant could not raise the affirmative defense because the negligence alleged therein arose during performance of a contract unrelated to the one plaintiff was suing upon. Specifically, plaintiff states that defendant is barred from contesting payment of the instant debt because Sandrock paid plaintiff in full for the alleged negligent performance.

A guaranty is a mercantile instrument serving the uses and convenience of commercial intercourse. As with any contract, it should be construed according to what fairly may be said to be the understanding of the parties. (*Fannin State Bank v. Grossman* (1961), 30 Ill. App. 2d 484, 488-89, 175 N.E.2d 268, 270.) The instant guaranty provided, in pertinent part:

"In consideration of your [plaintiff] extending said credit to the (firm name) *Sandrock Company*, the undersigned [defendant] hereby unconditionally guarantees payment of whatever amount the said (firm name) *Sandrock Company* shall at any time owe to [plaintiff], its divisions and subsidiaries, on account of material and equipment hereafter furnished or sold, and services hereafter rendered, whether said indebtedness is in the form of notes, bills or open account."

The agreement states that defendant will be liable to plaintiff for any sums Sandrock owed to plaintiff at any time, up to a limit of $10,000.

At the time of trial Sandrock owed plaintiff $9,000 plus interest minus any valid setoffs Sandrock had against this amount. Thus, the $2,763.22 payment made to plaintiff by Sandrock's trustee in bankruptcy, as well as any legal claims Sandrock had against plaintiff, could be considered by the trial court in determining Sandrock's, and ultimately defendant's, obligation to plaintiff. While it is well settled in Illinois that a party to a contract cannot refuse performance because the other party has violated a separate contract between them (*Rebaque v. Forsythe Racing, Inc.* (1985), 134 Ill. App. 3d 778, 782, 480 N.E.2d 1338, 1341), this principle does not apply to the case at bar because plaintiff allegedly violated its separate contract with Sandrock, not defendant. Defendant's letter of guaranty merely makes defendant responsible only for sums owed to plaintiff by Sandrock.

■■ Plaintiff finally urges on appeal that the trial court's finding in favor of defendant on the affirmative defense was contrary to the manifest weight of the evidence. Specifically, plaintiff alleges that defendant was not a credible witness because (1) defendant knew how substantial the damage to the well was prior to May 1980, (2) that a letter from Sandrock dated November 29, 1979, refutes defendant's claim that he was present when the allegedly negligent work was performed, (3) that the work order for the Sandrock well allegedly damaged by plaintiff was signed by an unauthorized person even though defendant claimed he was on site at the time, (4) that defendant did not complain of defective workmanship on the damaged Sandrock well after December 1, 1979, and (5) that defendant could not recall Sandrock's July 20, 1980, attempt to pay off Sandrock's account with plaintiff. Alternatively, plaintiff alleges that defendant did not establish gross negligence or wilful misconduct on the part of plaintiff in performing the work on Sandrock's damaged well.

Defendant testified that the well in question did not come into production until May 1980. Consequently, it would have been impossible for defendant to have known how substantial the damage to the well was prior to that time. While the letter from Sandrock's controller dated November 29, 1979, refers only to a "production manager" being on site when the well was damaged, it does not refute defendant's testimony that he also was present. Moreover, defendant's testimony regarding activities on site on the day in question was sufficiently detailed so as to allow the trial court to conclude that defendant was present. Although an unauthorized person did sign plaintiff's work order for Sandrock's damaged well prior to work being performed, we note that virtually every other work order between

Sandrock and plaintiff was signed by defendant. Moreover, as the trial court properly could have found that defendant was on site when the damage occurred, we reject plaintiff's insinuation that defendant's failure to sign this work order was an attempt to deceive both plaintiff and the court. While defendant neither complained of defective workmanship after December 1, 1979, nor could recall whether Sandrock had attempted to pay plaintiff, these are not fatal discrepancies. The trial court properly could have viewed them as having minimal impact on defendant's credibility.

The contract between plaintiff and Sandrock provided, in pertinent part:

> "[Plaintiff] shall not be responsible for and [Sandrock] shall secure [plaintiff] against any liability for damage to property of [Sandrock] *** unless caused by the willful misconduct or gross negligence of [plaintiff], this provision applying to but not limited to subsurface damage and surface damage arising from subsurface damage."

While we agree that this provision made plaintiff liable to Sandrock only for gross negligence or wilful misconduct, "want of skill of operators or insufficiency of instruments" may constitute gross negligence. (See *Bowman & Bull Co. v. Postal Telegraph-Cable Co.* (1919), 290 Ill. 155, 159, 124 N.E. 851, 853.) In the instant case, Sandrock specifically requested that certain equipment be present on site so that the concrete pumped into the well would properly seal the well off from Illinois Power's natural-gas storage area without affecting Sandrock's drilling operations. The evidence established that one of plaintiff's employees failed to properly use this equipment, causing damage to the well. On the basis of this evidence, we conclude that the trial court properly could have found that plaintiff was grossly negligent.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

KARNS, P.J., and WELCH, J., concur.