Argued December 3, 1959, affirmed February 24, 1960

# IRISH & SWARTZ STORES *v.* THE FIRST NATIONAL BANK OF EUGENE

349 P. 2d 814

*Wolf D. Von Otterstedt,* Eugene, argued the cause for appellant. On the brief were Husband & Johnson, Eugene.

*Edward A. Butler,* Eugene, argued the cause for respondent. On the brief were Harris, Butler, Husk & Gleaves and James C. Goode, Eugene.

Before McALLISTER, Chief Justice, and ROSSMAN, O'CONNELL and REDDING, Justices.

O'CONNELL, J.

This is an action to recover for the alleged breach of a written contract of bailment entered into between

the plaintiff store as bailor and the defendant bank as bailee.

The action is brought to recover approximately $6,000 which was the value of money and checks contained in a canvas money bag allegedly deposited at about 10:40 p.m., May 29, 1953 by William Knebel, the manager of one of plaintiff's stores. Neither the bag nor its contents have been accounted for since the alleged deposit. The case was tried to a jury which returned a verdict for the defendant. The plaintiff appeals from a judgment on the verdict.

The defendant's night depository device may be described as follows. In the outside wall of the bank building was a metal door which was connected to a metal tray or bucket in the interior of the upper part of a tube or chute leading to a vault in the basement of the bank. As the outer door was opened it raised the tray into a position ready to receive the canvas money bag; as the door was closed, the mouth of the tray tilted toward the opening in the chute and when the door was finally closed the tray would, if operating properly, discharge the bag into the chute. To prevent access to the vault from the opening above, a set of metal teeth automatically covered the opening in the chute below the tray when the exterior door was opened. On a metal plate just above the tray the following warning was printed:

## " — CAUTION —

AFTER DEPOSIT HAS BEEN
MADE AND DOOR CLOSED —
REOPEN TO MAKE SURE THE
BAG HAS ENTERED CHUTE."

A picture of the upper part of the depository is reproduced in the margin.[1]

Each customer entering into the written agreement with defendant for the use of the night depository was furnished one or more keys to the outer metal door. There were 93 such customers. The canvas money bags, each bearing a serial number, were also furnished by the bank.

The morning after the deposit was made the bags were available to the customer. The bank surrendered the locked bag to its customer, who then made the deposit himself, normally after the contents of the bag had first been checked and recorded by the customer's bookkeeper or bookkeeping service.

[1]

The written depository agreement signed by the plaintiff contained the following provisions by which the customer agreed:

"(1) That said Special Depository is provided by the Bank, without compensation, as a convenience to and at the risk of the undersigned, and the Bank shall not be required to carry insurance on said Special Depository or the contents of any bag deposited therein nor shall the Bank be responsible for any loss of any bag or its contents or any part thereof;

\* \* \* \* \*

"(6) That any fee charged by the Bank for use of said Special Depository is for the sole purpose of reimbursing it for the expense of providing and maintaining the said Special Depository and rendering such service as may be incidental thereto and in no case shall such fee constitute the Bank a voluntary depository for reward;"

The defendant pleaded that the plaintiff's deposit was made pursuant to the terms of the depository agreement. Plaintiff's reply alleges that the contract "is in contravention of the statutes of the State of Oregon, against public policy and good morals, without any authority and that by reason thereof the said writing is utterly void and that no just right of defense has accrued thereon and thereby to said defendant.

At the close of plaintiff's case in chief the defendant moved for an involuntary nonsuit on the ground that "plaintiff has shown that he bases this action upon a contract in writing, which is admitted in the pleadings, and on which we claim the defendant is entitled to an involuntary nonsuit against the plaintiff." The motion was denied. When both sides had rested, defendant moved for a directed verdict, including as a part of its grounds "that the pleadings

themselves show the contract was submitted and we are entitled to judgment on the pleadings." The motion was denied.

The only issue which was presented to the jury was that of delivery, i.e., did plaintiff make a delivery of the bag in question (numbered 447) to the defendant? This question was put to the jury as a special interrogatory and to which it replied, "No."

The plaintiff's only assignment of error is directed at the trial court's instruction with respect to the delivery of the bag. The part of the instruction pertinent to this appeal was as follows:

"* * * if you find from the evidence presented in this case that the plaintiff * * * did deliver to the defendant * * * by depositing that money bag in the night depository vault on the evening of May 29, 1953, then the law would raise a presumption that the failure to return the money bag was caused by the negligence of the bank.

"However, before you can find for the plaintiff in this case you must find from a preponderance of the evidence—and on this the plaintiff has the burden of proof—that the plaintiff made a complete delivery of the bag to the bank. Since there is no representative of the bank on duty to sign a receipt or acknowledge delivery it is necessary in order to accomplish what we call a complete delivery for the plaintiff to prove that the bag actually went down the chute, that is, it went down into the vault. It would be insufficient delivery if the plaintiff merely proved that the bag was placed in the tray which you saw."

After the jury retired it requested further instructions, whereupon the trial court gave the following instruction (a part is deleted):

"* * * on the questions that you have asked with reference to the facilities offered by the bank,

before the bank would be liable for the loss it would be necessary for the plaintiff to prove that it was the sole fault of the bank; in other words, the plaintiff, itself, was free from fault in the use of the facilities.

"Now, I instructed you previously that the plaintiff must prove that the bag was deposited in such a way that it actually entered the chute, and that is the instruction you are to apply in this case. The plaintiff must prove not merely that they placed the bag in the receptical [sic] but that they complied with the printed instructions on the door and assured themselves that the bag actually went down the chute before the bank would have any liability in this case."

The plaintiff excepted to both of these instructions. It contends that the instructions do not correctly reflect the law relating to the bailment relationship which was created in the instant case.

Since the case presented to the jury and to us on appeal turns on the question of whether plaintiff effected a delivery of bag number 447 to the defendant, we shall consider the evidence relating to the deposit of the bag by plaintiff's manager, William Knebel.

According to plaintiff's evidence Knebel, having possession of bag number 447 containing the day's receipts from the store managed by him, was driven to the bank about 10:30 on the night of May 29, 1953 by William Jones, an escort employed by plaintiff to protect its employees during the course of making such deposits. When they arrived at the bank Jones did not accompany Knebel to the depository door but stood alongside of his car which had been parked at the curbing about 12 to 15 feet from the door. Knebel went to the depository, took out his key, unlocked the door, opened it and inserted the bag in the tray. Jones

saw these movements although he could not see the bag after it had been placed in the tray because the interior of the depository was too dark. Knebel did not have a flashlight and there was no light in or near the depository, although there was a street light nearby. Jones testified that Knebel put the bag in the depository, shut the door, reopened it and shut it again. When Knebel was examined on this point he "couldn't swear" whether he reopened and reshut the door, but he said, "I feel sure that I did because it was the practice that we followed, and something that you do automatically." The defendant produced evidence to show that it had never received the bag in its basement vault.

There was evidence that a bag placed in the tray of the depository could jam or stick, and thus be retained in the tray after the door was closed. Apparently there was also a possibility that the bag could be retained in the upper part of the chute if a part of the bag was wedged between the tray and the wall of the chute. The presence of the cautionary sign suggests that these possibilities were known to the bank.

The cashier of the defendant bank testified that "it would be possible to jam a bag" but he also testified in effect that once a bag left the tray and entered the chute there was no way of extracting the bag from the chute through the exterior opening.

Plaintiff admits that it has the burden of proving that a bailment relation was created through the delivery of the bag to defendant, but it contends that the trial court's instruction made this burden more onerous than the law requires under the circumstances of this case.

It will be recalled that the instruction first given

required plaintiff to prove that the bag was deposited in such a way that it actually "went down the chute, that is, went down into the vault." The instruction continued: "It would be insufficient delivery if the plaintiff merely proved that the bag was placed in the tray which you saw." And when the additional instructions were given at the jury's request the trial court informed the jury that "plaintiff must prove that the bag was deposited in such a way that it actually entered the chute."

Plaintiff contends that the delivery was complete when Knebel deposited the money bag in the tray and locked the vault door after "rechecking." This conclusion is based upon the proposition that delivery was complete when plaintiff had done everything which reasonably could be expected of it under the bailment agreement. Plaintiff argues that, having fulfilled its obligation in checking the tray, the failure of the bag to fall into the chute and thence into the basement vault must be charged to the defendant for its fault in providing an unworkable mechanism for the discharge of bags into the vault.

The defendant, on the other hand, contends that under a reasonable interpretation of the bailment agreement the responsibility for determining whether the bag had entered the chute rested upon the plaintiff. The trial court accepted the defendant's view of the transaction.

Thus, the issue as it was presented to the jury and to us in the briefs and in oral argument, is simply that of determining at what point in the process of depositing the bag in the depository the delivery of the bag was consummated. The defendant might have argued that even though a bailment was created by an effective delivery, it was excused from

liability under the exculpatory clause of its contract, but it did not advance this argument. Accepting then the issue as framed, we turn to its consideration.

■ The parties to a bailment agreement may expressly set the point at which delivery will be deemed to have been completed in order to give rise to the bailment relation. If the parties do not expressly make such provision, it is necessary to arrive at their intention by an interpretation of their bailment agreement in light of the circumstances attending its creation. These circumstances include the purposes for which the bailment transaction was entered into, the benefits to be received by the parties, the type of property involved, the opportunity which each has to exercise control over the subject matter of the bailment, and other facts. See: Brown on Personal Property (2d ed) §§ 73, 74, 75; 4 Elliott on Contracts, §§ 2992, 3002; Hale on Bailments and Carriers, pp 12, 28; Story on Bailments (4th ed) §§ 14, 15, 31, 32, 55, 56; 4 Williston on Contracts (rev ed) § 1032; Laidlaw, Principles of Bailment, 16 Cornell L Q 286 (1931); Shartel, Meanings of Possession, 16 Minn L Rev 611 (1932).

■ In the instant case the cautionary sign in the upper part of the depository may be regarded as a part of the bailment agreement. It clearly warns the depositor that it is his duty to "make sure the bag has entered the chute." It would be possible to construe this warning to mean only that in making a deposit the depositor must make certain that the bag is not in the tray, and once having done so that the defendant assumes the responsibility for the loss of the bag if it should be discharged from the tray but does not reach the vault.

We do not think that this is a fair interpretation

of the agreement of the parties. Here it was contemplated that the deposit would be made when the defendant's servants were not present. In the usual bailment transaction it is contemplated that bailee's actual control over the goods will begin at the same instant the bailor's control ends, and in such cases there is an opportunity for the alleged bailee to prove that the goods did not come into his hands. But in the present case the defendant, not being present when the deposits are made, has no effective way of proving that a bag was not in fact placed in the depository, or of proving that it was placed there in such a way as to make it possible for the depositor or someone else to remove it later. In view of this circumstance it is reasonable to regard the bailment agreement as imposing upon the depositor the duty to see that the bag entered the chute, or to put the same idea differently, it is reasonable to find an implied agreement that the risk of loss should fall on the depositor.

We find support for this position in *Kolt v. Cleveland Trust Co.*, 156 Ohio St 26, 99 NE2d 902 (1951). In holding that the defendant bank was not liable for the loss of money and checks allegedly deposited in defendant's night depository, the court adopted the following language from the lower court's opinion:

" 'Of necessity, no one representing the bank is present when a night deposit is made. Whether such deposit has actually been made must be established in every event by the evidence of the depositor. It would therefore be a very natural position of the bank to take that until the sack is actually accounted for by the bank's clerks in the ordinary procedure of accounting for night deposits sacks, such deposits should be at the risk of the depositor. Such a contract is not void as against public policy.' " 99 NE2d at page 904.

An additional factor which fortifies the foregoing interpretation is the exculpatory clause of the written depository contract. The clause clearly expresses the idea that the risk of loss shall be upon the depositor. Plaintiff agrees that the risk of loss shall be borne by it; that defendant shall not be liable for any loss of a bag or its contents, and that defendant shall not be required to carry insurance in connection with the use of the depository. Although this provision in itself may be sufficient by its express terms to save defendant from liability (and even though a delivery and the consequent bailment had been established), we shall consider it only as an aid in finding the intention of the parties as to the point at which defendant was to be regarded as having received the bags deposited in the depository. We think that the clause, fairly construed, sets delivery at least at the point where the bag has actually entered the chute in the sense that it cannot thereafter be retrieved from the exterior of the depository. This was the idea conveyed by the trial court's instruction.

The plaintiff argues that it is impossible as a practical matter to produce the kind of evidence which the instructions require plaintiff to present in order to recover. It may be said with equal force that it would be practically impossible for defendant to produce evidence to prove that a depositor did not put the bag in the depository or that he did so but that it failed to reach defendant's vault through the depositor's, and not the defendant's, fault. It was these very same difficulties of proof which undoubtedly prompted the bank to hedge its liability with the exculpatory clause of the written agreement and to place the cautionary sign in the depository to remind

374

the depositor of its duty to make certain that the bag was irretrievably put into the chute.

■ We have dealt with the present case on the assumption that delivery is the crucial point upon which defendant's liability is to be determined. However, the same result may be reached by treating the transaction as a completed bailment. In such case, of course, the burden of explaining the failure to account for the goods normally would be upon the bailee. *National Fire Ins. Co. v. Mogan,* 186 Or 285, 206 P2d 963 (1949); *Hillend v. Koltsch and Frink,* 183 Or 460, 192 P2d 274, 193 P2d 927 (1948); *Hansen v. Oregon-Wash. R. & N. Co.,* 97 Or 190, 188 P 963, 191 P 655 (1920). But the parties here have contracted specifically to exempt defendant from liability and if this provision can be given effect it will constitute another ground for sustaining the judgment of the lower court.

The cases are in conflict on the question of the bailee's right by contract to exonerate himself from liability for the loss of goods resulting from his own negligence. In *Pilson v. Tip-Top Auto Co.,* 67 Or 528, 535, 136 P 642 (1913), it was said:

"It is the better rule that a bailee for hire cannot by contract so limit his responsibility to the bailor as not to be liable for his own negligence or the negligence of his agents and servants: *Railroad Co. v. Lockwood,* 17 Wall. (84 U.S.) 357 (21 L. Ed. 627); *Louisville, N.A. & C.R. Co. v. Faylor,* 126 Ind. 126 (25 N.E. 869); *Pittsburg Etc. R. Co. v. Higgs,* 165 Ind. 694 (76 N.E. 299, 4 L.R.A. (N.S.) 1081); *Camp v. H. & N.Y.S. Co.,* 43 Conn. 333; *Davis v. Chicago M. & S.P.R. Co.,* 93 Wis. 470 (67 N.W. 16, 1132, 57 Am. St. Rep. 935, 33 L.R.A. 654); *Lancaster Co. Nat. Bank v. Smith,* 62 Pa. 47; *Memphis & C.R.R. Co. v. Jones,* 2 Head (Tenn.), 517; 3 Am. & Eng. Ency. of Law (2 ed), 750."

We do not think that the foregoing statement was intended as the pronouncement of a universal rule applicable to every bailment irrespective of its character.

There is nothing inherently bad about a contract provision which exempts one of the parties from liability. The parties are free to contract as they please, unless to permit them to do so would contravene the public interest. It is generally recognized that a bailee who is performing services for which the public has a substantial need should not be permitted to use this circumstance to coerce the members of the public into contracts exempting the bailee from liability for his negligence. In such cases the bailee's comparatively stronger bargaining power is regarded as an important factor. 6 Williston, Contracts (rev ed) § 1751C; The Significance of Comparative Bargaining Power in the Law of Exculpation, 37 Colum L Rev 248 (1937).

Probably of more significance is the bailee's duty to serve the public. 2 Restatement, Contracts, §§ 574 and 575 states the law in terms of this duty. Section 574 provides as follows:

> "A bargain for exemption from liability for the consequences of negligence not falling greatly below the standard established by law for the protection of others against unreasonable risk of harm, is legal except in the cases stated in § 575."

Section 575 (6) states that a bargain for exemption from liability is illegal if:

> "one of the parties is charged with a duty of public service, and the bargain relates to negligence in the performance of any part of its duty to the public, for which it has received or been promised compensation."

Another factor frequently mentioned as a ground for decision is summarized as follows:

> "* * * in many relationships there is a situation where one person is dealing contemporaneously with several others, so that a bargain limiting his liability to one of them is considered to have a tendency to lead to conduct injurious to others. This is the case where contracts are not made on an individual basis but by printed forms, tickets, or signs." Social relationship of parties as factor, 175 ALR 15, 16.

And it has been suggested that this fact of dealing generally with the public indiscriminately is a basis for treating the business as one affecting the public interest as distinct from a purely private business relationship. Note, 29 Chi-Kent L Rev 334 (1951). Bailees engaged in the former type of business are sometimes referred to as "professional" bailees. See, Dykstra, The Uses of a Bank's Night Depository Facilities, 70 Banking L J 121 (1953). In the article last cited the author characterizes a bank offering a night depository service as "an ordinary, not a professional, bailee. The customer had a choice of using, or not using, available night depository facilities. And the bank was free to make such facilities available on any terms it chose." 70 Banking L J at page 126.

A contrary view is expressed in 29 Chi-Kent L Rev 334, 339 (1951), where it is said that "the bank was conducting a business vitally touching the public interest and was in a position to dictate the terms upon which it would accept deposits, terms which the depositor was hardly in a position to dispute." It is possible to explain cases such as *Pilson v. Tip-Top Auto Co.,* supra, and *Simms v. Sullivan,* 100 Or 487, 198 P 240, 15 ALR 678 (1921) on the basis of the

public or professional character of the business in which the bailee is engaged.

■■ It is not necessary for us to decide whether the business of furnishing a night depository falls within one or more of the categories mentioned above because we are of the opinion that the peculiar character of the bailment bargained for in the present case warrants the recognition of an enforceable exculpatory clause. We so hold on the ground already alluded to, i.e., that the bailee is not present at the time the deposit is made and thus is not in a position to protect itself from dishonest claims made by customers asserting that deposits were made. This is the basis for the holding in *Kolt v. Cleveland Trust Co.*, supra, upon which we have already commented. The court considered the fact that the bailment arrangement was such that the bank's representatives would not be present at the time the deposit was allegedly made and could not, therefore, practically disprove the claim made by the customer that a deposit was made. In that case the court, borrowing the language from the intermediate court, stated its conclusion as follows:

> "* * * 'where the circumstances are such that the possession of another's property is attended with unusual risks, the parties dealing at arm's length as free agents may lawfully make any reasonable provision therefor as the circumstances justify.'" 99 NE2d at page 904.

Where the bailment contract provides that the deposit bag is to be opened by the bank out of the presence of the customer a different rule may be called for, *Ramsey Outdoor Store v. Chase Manhattan Bank*, 169 NYS2d 772 (City Ct NY 1957); and see, *Bernstein v. Northwestern Nat. Bank in Philadelphia*,

157 Pa Super 73, 41 A2d 440 (1945), but it is not necessary for us to decide the question in the present case.

Our recognition of the exculpatory clause under the circumstances of this case is in no way inimical to the public interest. The policy favoring the freedom to contract as one pleases should be recognized unless there is some contravening policy which outweighs it. We see nothing in the circumstances of the bargain entered into by the parties in the present case which would call for a rule depriving the defendant of the immunity for which it bargained. To apply the rule precluding exoneration by contract in the present case would, in effect, render the defendant defenseless against the dishonest claims of its customers. Until it can be shown that the public need for night depository services is so great that banks should be subjected to almost absolute liability, they should be permitted to bargain against this exceptional risk of loss.

The judgment is affirmed.