499 P.2d 991

**The VALLEY NATIONAL BANK of Arizona, a corporation, Appellant,**

v.

**Kim S. TANG et al., Appellees.**

**No. I CA–CIV 1628.**

Court of Appeals of Arizona,
Division 1,
Department B.
July 27, 1972.
Rehearing Denied Sept. 11, 1972.
Review Denied Nov. 21, 1972.

Rawlins, Ellis, Burrus & Kiewit by Norman D. Hall, Jr., Phoenix, for appellant.

Renaud, Cook, Miller & Cordova, P. A., by John H. Seidel, Phoenix, for appellees.

HAIRE, Chief Judge, Division 1.

This appeal by the Valley National Bank of Arizona arises out of a negligence action brought by plaintiffs as customers of the bank for loss of receipts placed by them in a night depository facility of one of its branches.

The stipulated facts showed that on August 30 and 31, 1968, the Friday and Saturday just before the Labor Day weekend, plaintiffs placed the sum of $26,898.42 in checks and cash in the night depository facility. The bank was locked on Friday evening, August 30, 1968, and was not opened again until Monday, September 2, 1968, Labor Day, when employees of a janitorial service entered the bank at approximately 4:30 p. m. After cleaning the premises, they left at approximately 10:00 p. m. and locked it again.

Thereafter, sometime between 10:00 p. m. on Monday, September 2, and 7:40 a. m. on Tuesday, September 3, a person or persons unknown broke into the bank, forcibly entered the night depository safe with the aid of a cutting torch, and removed the contents. All of plaintiffs' funds were removed, but later a portion was recovered by law enforcement authorities, leaving plaintiffs' total loss at $15,131.99 as of the date of trial.

Defendant contends that its contract with the depositor limiting its liability was valid and enforceable. The contract read, in relevant part, as follows:

"The undersigned agrees that *each use of the night depository facilities shall be at the sole risk of undersigned* and further agrees that the relation of debtor and creditor between said bank and the undersigned shall not arise out of any use or attempted use of such facilities, nor until the contents of any such bag have been regularly deposited in the said bank and a receipt issued therefor." (Emphasis added).

Additionally, a second contract, designated "Supplement to Night Depository Agreement" read, in relevant part, as follows:

"The undersigned authorizes The Valley National Bank of Phoenix, upon removal of the undersigned's bag placed in the night depository to open said bag, count the funds enclosed therein and credit the account of the undersigned therewith. The undersigned agrees to accept as final the bank's count of such deposit. It is expressly understood that each removal and opening of the undersigned's bag from the night depository facility and the counting of the funds therein shall be at the undersigned's sole risk at all times."

The first issue confronting us on appeal with regard to these provisions is: May a bank limit its liability in connection with the use of its night depository facilities so that its customers use said facilities at their own risk? The only case construing Arizona law which we have found which is even remotely in point is Southwest Forest Industries, Inc. v. Westinghouse Electric Corp., 422 F.2d 1013 (9 Cir. 1970), cert. denied, 400 U.S. 902, 91 S.Ct. 138, 27 L. Ed.2d 138 (1970). In that case the federal court of appeals, applying Arizona law in accordance with its diversity jurisdiction, stated that the general rule was to permit contracts limiting tort liability when they have been properly bargained for.

The question here is whether such contracts are permissible when bargained for between a bank and its customers. 10 Am.Jur.2d Banks § 358 (1963) in discussing night deposits, states in relevant part:

"It seems proper for the bank to take the position that until the deposit sack is actually accounted for by the bank's clerks in the ordinary procedure of accounting for night deposit sacks, such deposits are at the risk of the depositor, and a contract to such effect between the bank and the depositor is held not void as against public policy."

This principle of law has been fully discussed in the Oregon case of Irish & Swartz Stores v. First National Bank of Eugene, 220 Or. 362, 349 P.2d 814 (1960).

**42**

The written depository agreement in that case provided in relevant part, "nor shall the Bank be responsible for any loss of any bag or its contents or any part thereof." 349 P.2d at 817. The Oregon court held that this language was sufficient to immunize the bank from liability where the contents of a bag were allegedly placed in a facility and then mysteriously lost. *See also*, Kolt v. Cleveland Trust Co., 156 Ohio St. 26, 99 N.E.2d 902 (1951), Annot., 27 A.L.R.2d 525 (1953).

While the facts in Irish & Swartz Stores differ from the case at hand, in that the question of an actual deposit was not questioned here, much of what was said in that case regarding the validity of exculpatory clauses is relevant to this case. The court began its discussion with the recognition that, "[t]he cases are in conflict on the question of the bailee's right by contract to exonerate himself from liability for the loss of goods resulting from his own negligence." 349 P.2d at 820. Then the court stated:

"There is nothing inherently bad about a contract provision which exempts one of the parties from liability. The parties are free to contract as they please, unless to permit them to do so would contravene the public interest. It is generally recognized that a bailee who is performing services for which the public has a substantial need should not be permitted to use this circumstance to coerce the members of the public into contracts exempting the bailee from liability for his negligence. In such cases the bailee's comparatively stronger bargaining power is regarded as an important factor. 6 Williston, Contracts (rev. ed.) § 1751C; The Significance of Comparative Bargaining Power in the Law of Exculpation, 37 Colum.L.Rev. 248 (1937)." 349 P.2d at 821.

The court also outlined the conflicting views as to whether a bank is generally considered to be a "professional bailee". Quoting from Dykstra, The Uses of a Bank's Night Depository Facility, 70 Banking L.J. 121, 126 (1953) the court noted that one view:

". . . characterizes a bank offering a night depository service as 'an ordinary, not a professional, bailee. The customer had a choice of using, or not using, available night depository facilities. And the bank was free to make such facilities available on any terms it chose.'" 349 P.2d at 821.

Then the court observed:

"A contrary view is expressed in 29 Chi-Kent L.Rev. 334, 339 (1951), where it is said that 'the bank was conducting a business vitally touching the public interest and was in a position to dictate the terms upon which it would accept deposits, terms which the depositor was hardly in a position to dispute.'" 349 P.2d at 821.

We are of the opinion that the first view stated is eminently more sensible. While a customer may not be in a position to bargain for different terms on a night depository agreement, he is free to use or not to use the facility. If he chooses to use it, there is no reason in terms of law or of social policy, why a bank cannot make the facility available under terms and conditions which place the risk of loss on the customer. As has been pointed out in Central National Bank of Cleveland v. Gallagher, 13 Ohio App.2d 115, 234 N.E.2d 524 (1968), a bank depositor is not restricted in his choice of banks as a traveler may be in his use of a common carrier. The following statement by the court in Irish & Swartz Stores, *supra,* expresses our view exactly with regard to this case:

"Our recognition of the exculpatory clause under the circumstances of this case is in no way inimical to the public interest. The policy favoring the freedom to contract as one pleases should be recognized unless there is some contravening policy which outweighs it. We see nothing in the circumstances of the bargain entered into by the parties in the present case which would call for a rule depriving the defendant of the immunity

for which it bargained. . . . Until it can be shown that the public need for night depository services is so great that banks should be subjected to almost absolute liability, they should be permitted to bargain against this exceptional risk of loss." 349 P.2d at 822.

■ In urging that the clauses before us are not valid and enforceable, appellees point to A.R.S. § 44–2603, which provides:

"A. The effect of the provisions of this article may be varied by agreement except that *no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure*; but the parties may by agreement determine the standards by which such responsibility is to be measured, if such standards are not manifestly unreasonable." (Emphasis added).

We think this provision is inapplicable to night depository facilities. A reading of this particular article, which is entitled "Bank Deposits and Collections", reveals in § 44–2602, subsec. B that this article applies to the handling by banks of items "for . . . presentment, payment or collection". Nothing in the article refers to night depository facilities, and it is clear that it applies only to a bank's dealing with negotiable and non-negotiable documents.

We now come to what we consider the main issue in this appeal—that is, assuming the validity of the exculpatory provisions, what application do they have to the facts of this case? Do they exclude liability for negligence, or for something less? This question, essentially one of construction of exculpatory clauses, has not been discussed extensively by Arizona cases; but the authorities cited in Southwest Forest Industries, Inc., *supra*, 422 F.2d at 1020, offer some guidance.

■ In these authorities, we find near unanimity on the proposition that clauses which purport to exclude liability for negligence must speak clearly and directly to the conduct at issue. Professor Prosser adequately summarizes the authorities when he says:

"If an express agreement exempting the defendant from liability for his negligence is to be sustained, it must appear that its terms were brought home to the plaintiff; . . . . *It is also necessary that the express terms of the agreement be applicable to the particular misconduct of the defendant.*" W. Prosser, The Law of Torts, § 67, at 458–59 (3d ed. 1964). (Emphasis added).

Building on this, the Restatement of Torts, in a comment to the rule relating to express assumption of risk, states in relevant part:

"d. In order for the agreement to assume the risk to be effective, it must also appear that its terms were intended by both parties to apply to the particular conduct of the defendant which has caused the harm. Again, where the agreement is drawn by the defendant and the plaintiff passively accepts it, its terms will ordinarily be construed strictly against the defendant. In particular, general clauses exempting the defendant from all liability for loss or damage will not be construed to include loss or damage resulting from his intentional, negligent, or reckless misconduct, unless the circumstances clearly indicate that such was the plaintiff's understanding and intention." Restatement (Second) of Torts, § 496 B, comment d at 566–67 (1965).

■■ The principal reason for such a construction is to assure that there has been actual agreement between the parties that the defendant shall not be liable for the consequences of future conduct which would otherwise be negligent. In our view the statement that "each use of the night depository facilities shall be at the sole risk of the undersigned" does not import such a broad unrestricted meaning as to include future negligent conduct. On the other hand, the language used clearly shows an acceptance by the plaintiffs of defendant's facilities which were in existence at the

time the agreements were entered into. Under this contractual provision plaintiffs agreed that their use of these facilities would be at their sole risk. Although the exculpatory language is not broad enough to absolve defendant from future negligent conduct in the *use* of these existing facilities (as, for example, leaving the bank door or safe door unlocked) it would absolve defendant from any claim of liability based solely upon a claim that the facilities were in and of themselves inadequate.

At trial plaintiffs introduced excerpts from the depositions of two bank employees, one being the manager of the branch in question at the time of the burglary and the other being an assistant vice-president and manager of the security department for the defendant bank. Through their depositions plaintiffs elicited the following evidence:

1. The only lock mechanism on the outside door through which the burglars apparently gained entry was in the doorknob; no chains, bolts, or other type of lock were used to secure that door.

2. The night depository safe, which was successfully entered, had 1″ thick steel walls encased in six inches of concrete, whereas the main vault was of much heavier construction.

3. No self-activating burglar alarm systems or other security devices, other than "the quality of the vaults themselves", existed at the time in question to protect against burglary.

4. Such burglar alarm systems were being installed in other night depository facilities on a selective basis.

5. Three months earlier, in May of 1968, a very similar burglary of a night depository facility at another branch of defendant bank had occurred.

It is clear that all of plaintiffs' evidence related to claimed inadequacies which existed at the time plaintiffs accepted defendant's facilities and agreed to use these facilities at plaintiffs' "sole risk". There was no evidence that defendant failed to lock doors, turn on existing night lights, or were in any manner actively negligent in the use of these facilities. Nor is there any claim made that defendant's facilities were in any way misrepresented or deceptive in physical appearance. Under these circumstances we are of the opinion that defendant's pre-trial motion for summary judgment should have been granted, and further that the trial court erred in not granting defendant's motion for directed verdict.

In light of our holding we feel it is unnecessary to express any view regarding alleged error in the court's instructions to the jury as to the weight to be afforded evidence of conformity by the defendant to local custom.

The judgment entered by the trial court is reversed with directions to enter judgment for the defendant.

EUBANK and JACOBSON, JJ., concur.