**WESTERN NATIONAL BANK OF CAS-PER, a national banking corporation,**
Plaintiff,

v.

**HAWKEYE–SECURITY INSURANCE COMPANY, Defendant.**

No. C74–28.

United States District Court,
D. Wyoming.

Sept. 10, 1974.

Mayne W. Miller, Casper, Wyo., for plaintiff.

William S. Bon, Casper, Wyo., and Guy, Williams & White, Cheyenne, Wyo., for defendant.

*Judge's Memorandum*

KERR, District Judge.

Western National Bank of Casper (Western) instituted this action against Hawkeye Security Insurance Company (Hawkeye) seeking to recover on an insurance policy issued by Hawkeye. In this diversity action the statutory amount is satisfied pursuant to 28 U.S. C.A. § 1332.

The matter was submitted to the Court upon a stipulation of facts, the parties agreeing that there is no genuine issue as to any material fact. Each of the parties has moved for summary judgment.

Hawkeye had issued to Western a "bankers' blanket bond" which was in full force and effect on January 12, 1974. On the night of January 12, 1974, an employee of Albertson's Supermarket, Inc. (Albertson's) placed a deposit sack in the night depository chute of Western. The sack apparently lodged in the chute and failed to drop into the depository. The same night another customer removed the sack. The sack contained $22,347.32 in currency and checks. This customer, whose identity is here not relevant, later pled guilty to bank larceny and was sentenced by this Court. The facts reveal that Western was aware of other deposits being caught in the receptacle and not falling through the chute as intended.

On January 22, 1974, Western voluntarily paid to Albertson's the sum of $17,797.32, which represented the amount taken from the depository, less certain recoveries and adjustments made by Albertson's. Western filed its proof of loss with Hawkeye, and its demands for payment of the $17,797.32 were denied by Hawkeye. It is this amount which is the crux of the controversy. Hawkeye's contentions are: (1) the theft from the depository was not in fact a theft of bank property so as to be an insured loss; (2) Western's payment to Albertson's was voluntary and a loss for which Western was not liable; (3) the loss was not that of any customer, or representative thereof, so as to make it an insurable loss. Western contends that the loss was an insured risk regardless of whether it was liable to Albert-

son's and regardless of whether it was negligent.

Some corollary facts bearing on the dispute show that Albertson's executed a depository agreement, an exculpatory clause of which provided:

> "[T]he undersigned expressly agrees that the use of said Depository is a mere gratuitous privilege and that the exercise of such privilege shall be at the sole risk of the undersigned and you shall not be responsible for the safekeeping of any deposit made in said Depository."

There was no charge or fee levied for use of the night depository.

Hawkeye under its bond agreed to indemnify Western for:

> "(B) Loss of Property (occurring with or without negligence or violence) through robbery, burglary, common-law or *statutory larceny*, theft . . . while the Property is (or is supposed to be) *lodged or deposited within any* offices or *premises.* . . ."
>
> "*Loss of any of the items of property enumerated in the paragraph defining Property, in the possession of any customer of the Insured or of any representative of such customer, whether or not the Insured is liable for the loss thereof*
>
> (a) through any hazard specified in the preceding paragraph, while such property is within any of the Insured's offices covered hereunder. . . ." (emphasis supplied)

but excluded any loss caused by such customer or any representative of such customer.

The indemnity bond provided that:

> "(b) Property means money (i. e., currency, coins, bank notes, Federal Reserve notes), . . . bonds, securities, evidences of debt . . . notes, checks . . . money orders . . . and all other instruments similar to or in the nature of the foregoing, in which the Insured has an interest . . . ."

Among the exclusions, the bond agreement did not insure any loss of property contained in customers' safe deposit boxes unless an act of an employee of the insured would render it legally liable therefor.

■■■ Although the relationship between a general depositor and a bank may turn on the parties' intentions, In re Riverton State Bank, 47 Wyo. 469, 38 P.2d 603 (1935), it is generally held that in the period between deposit and actual receipt by the bank that a relationship of bailment arises. See Bernstein v. Northwestern National Bank, 157 Pa.Super. 73, 41 A.2d 440 (1945). Where the deposit is made in a night depository, the bailment created is not comparable to the ordinary bailment where actual delivery is made to the bailee. In such a case, the bank may not take possession by or through an employee for several hours or possibly days. "A bank is not relieved from liability for the loss of a deposit made after banking hours if it is its custom to receive deposits at that time for the accommodation of customers. A contract limiting a bank's liability or exonerating it, from loss of 'night deposits' made in sacks through a chute opening has been held not to be void as against public policy." 10 Am.Jur.2d Banks § 429. Where a deposit is made by delivery to a night depository, therefore, a bailor-bailee relationship arises between the depositor and the bank. This relationship does not assume that of creditor-debtor until the bank takes some step to make it a deposit, for delivery to the depository was only a deposit in the making. See Bernstein v. Northwestern National Bank, 41 A.2d at 441, above; 27 A.L.R.2d 530. As a bailee the bank is liable for any ordinary negligence on its part in maintaining the night depository, Lacour v. Merchants Trust & Savings Bank, 153 So.2d 599 (La.App.1963), unless it has specifically contracted against its liability, or unless the depositor expressly assumes the risk for use of the depository. See Valley National Bank v. Tang, 18 Ariz.App. 40, 499 P.2d 991 (1972). Albertson's used

the night depository as it agreed, at its sole risk. Western had not assumed custody of the satchel so that no creditor-debtor status had arisen. It is clear, from the foregoing, that the payment by Western to Albertson's was not a legal obligation nor was Western legally found to make such a payment.

The foregoing discussion thus poses the issue of whether Hawkeye, under the provisions of its bankers' blanket bond, is liable to Western for monies paid voluntarily by Western to a customer, whose intended deposit, left in a night depository, was stolen prior to Western assuming actual control of the deposit?

Hawkeye, in its Insuring Agreement (B), agreed to indemnify Western *for any loss of property, occurring* with or without negligence, *through* robbery, *larceny*, theft, or burglary *while the property was*, or was supposed to be, *lodged or deposited within any offices or premises*. Hawkeye also insured any loss of property in the possession of any customer of Western or of any representative of such customer, whether or not Western was liable for the loss thereof. The bond defined property as including currency, notes, checks, etc., in which Western had an interest and which was held by Western for any purpose, in any capacity, whether Western was liable therefor or not.

In principio the deposit by Albertson's falls within the definition of property as detailed by the bond. See First National Bank v. Insurance Co. of North America, 424 F.2d 312 (7th Cir. 1970). The satchel contained currency and checks and as bailee, Western had an interest. As bailee, Western was liable, save for the exculpatory clause, in ensuring the return of the property. In this respect, the issue is not before the Court as to whether the exculpatory clause is in fact a valid disclaimer.

■ In construing the terms of an insurance contract, it is the Court's duty to ascertain the intention of the parties as expressed. This rule has been applied to the construction of bankers'

blanket bonds. Couch on Insurance 2d § 15:76 (2d ed. 1967). Under Wyoming law the language of the bond is measured, not by what the insurer intended its words to mean, rather, by what a reasonable person in the position of the insured would understand them to mean. If there is any doubt, the language of the bond is to be most strongly construed against the insurer. See Kukuchka v. Imperial Casualty & Indemnity Co., 237 F.Supp. 117 (D.C.Wyo. 1965); Kahn v. Traders Insurance Co., 4 Wyo. 419, 34 P. 1059 (1893); Couch on Insurance, § 15:76, above. Such bankers' blanket bonds are generally not viewed as being contracts made for the benefit of any third party beneficiaries, i. e., depositors. See Ronnau v. Caravan International Corporation, 205 Kan. 154, 468 P.2d 118 (1970); KAMI Kountry Broadcasting Co. v. United States Fidelity & Guaranty Co., 190 Neb. 330, 208 N.W.2d 254 (1973); Aetna Life & Casualty Co. v. Hampton State Bank, 497 S.W.2d 80 (Tex.Civ.App.1973); Lacour v. Merchants Trust & Savings Bank, La. App., 153 So.2d 599, above. They are designed to indemnify the insured for specified insured risks. By its caption, the term "blanket bond" in itself indicates wide coverage, and the contract is to be interpreted in this fashion. See Baltimore Bank & Trust Co. v. United State Fidelity & Guaranty Co., 436 F.2d 743, 746 (8th Cir. 1971).

■■ As stated earlier, the delivery by Albertson's to the night depository was not a deposit in fact, but rather was only a deposit in the making. Some unequivocal act by the bank was necessary to make it a general deposit. See Kolt v. Cleveland Trust Co., 156 Ohio St. 26, 99 N.E.2d 902 (1951); Bernstein v. Northwestern National Bank, 157 Pa.Super. 73, 41 A.2d 440, above. It was thus not property *deposited* within any offices or premises of the insured under paragraph (B) of the bond agreement.

Although the property may not have been "deposited" as that is herein defined, was the property *lodged* on or within the premises? The satchel was

**512**

placed in the receptacle with the intention that it be safeguarded and preserved by the bailee, Western. At Volume 25A, Words and Phrases, "to lodge" is defined as to place on deposit for safeguarding or preserving, as to lodge money or records in a place of deposit. The night depository was a place of deposit and articles were "lodged" there for purposes of safeguarding. As a bailee, in the proper case, Western might be liable for its ordinary negligence and certainly for any gross negligence. The property was held, whether gratuitously or not, by Western and under the plain and clear language of the bond, Hawkeye was liable. The satchel was the corpus of bank larceny. The loss, therefore, was of property lodged on the premises that was lost due to larceny. In summation, the bond agreement did cover the situation herein.

The motion for summary judgment filed by and on behalf of Western is granted and a judgment will be entered accordingly.