Phillips Home Furnishings, Inc., Appellant, *v.* Continental Bank.

Argued September 9, 1974. Before WATKINS, P. J.,
JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and
SPAETH, JJ.

*Howard E. Davidson*, with him *Astor & Weiss*, for
appellant.

*Alan Gershenson*, with him *Blank, Rome, Klaus &
Comisky*, for appellee.

OPINION BY JACOBS, J., December 11, 1974:

This case is before us on appeal from a lower court
order granting Continental Bank's motion for sum-
mary judgment.[1]

The facts as alleged by the appellant show that on
the evening of June 16, 1973, Max Shectman prepared
a bank deposit of $5,669.00 in receipts from his business,
Phillips Home Furnishings, Inc. He then picked up
his wife at her place of employment and proceeded
to an office of Continental Bank [hereinafter Bank],
where he had done his banking for nearly thirty years.

------

[1] Pa. R.C.P. 1035.

Upon arriving at the Bank, he proceeded to the Bank's Night Depository Safe, the opening for which was located on the outside wall, properly placed his deposit in the safe, and returned home. Five days later, not having received confirmation of his deposit, Mr. Shectman phoned the Bank only to learn that it had no record of the deposit ever having been made, and no explanation of what might have happened to it.

In response to the understandably anxious inquiries of its customer, the Bank showed Mr. Shectman a copy of the "Night Depository Agreement" signed by him the previous year. The Agreement states in pertinent part:

"1. Bank grants to the undersigned the privilege of using the Night Depository gratuitously and solely as an accommodation to the undersigned; and the exercise of the privilege by the undersigned will be at the sole risk of the undersigned. Bank will employ such safeguards . . . as it deems proper, without any liability to the undersigned for their sufficiency.

". . .

"4. Bank shall be under no liability with respect to anything placed in the Night Depository, except for the amount of cash and checks actually taken into its possession upon opening the Night Depository Safe. In the event of any dispute as to whether or not the said bag dropped down the chute and entered the Night Depository Safe, or came into the possession of Bank, the report of the employee of Bank who shall open the Safe upon the following business day shall be conclusive and binding upon the undersigned.

"5. The relationship of debtor and creditor between Bank and the undersigned shall not arise until the Night Deposit bag has been opened . . . and the contents found therein counted and credited to the account of the undersigned. Until that time, Bank shall be obligated to exercise toward the Night Deposit bag and its

contents only that degree of care required of Bank in the case of a gratuitous bailment."

The Bank, relying upon this agreement, refused to credit the account of the appellant; and the appellant brought an action in assumpsit for failure to credit its account and in trespass for conversion. The court below found the Night Depository Agreement to be legal and binding; found that thereunder the appellant was bound by the report of the Bank's employee who opened the safe;[2] and that the Bank was, therefore, "conclusively absolved of all liability." Opinion of Judge HIRSH at 2.

## I

The first issue thus presented is whether a bank may contractually absolve itself from all liability in connection with the use of a night depository facility, so that its customers are required to use the facility at their sole risk. Other courts which have examined this question have concluded that there is nothing inherently wrong with permitting a bank to make its Night Depository Service available under terms and conditions which place the risk of loss on the customer. *Valley Nat'l Bank v. Tang,* 18 Ariz. App. 40, 499 P.2d 991 (1972); *Irish & Swartz Stores v. First Nat'l Bank,* 220 Or. 362, 349 P.2d 814 (1960); *Kolt v. Cleveland Trust Co.,* 156 Ohio St. 26, 99 N.E.2d 902 (1951); *see Bernstein v. Northwestern Nat'l Bank,* 157 Pa. Superior Ct. 73, 41 A.2d 440 (1945), *allocatur refused,* 159 Pa. Superior Ct. xxv (1947) (liability in absence of agreement); *Bowling Corp. v. Long Island Nat'l Bank,* 292 N.Y.S.2d 562, 57 Misc. 2d 337 (Nassau County 1968); *Lacour v. Merchants Trust & Sav. Bank,* 153 So. 2d

---

[2] Affidavits of the two employees who jointly opened the safe and found no bag belonging to the appellant were filed with the motion for summary judgment.

599 (La. App. 1963) (Bank liable in absence of contractual agreement) ; *Annot.*, Liability of Bank in Connection with Night Depository Service, 27 A.L.R. 2d 530 (1953) ; *see also* Dykstra, The Uses of a Bank's Night Depository Facility, 70 Banking L. J. 121 (1953) ; Note, 29 Chi-Kent L. Rev. 334 (1951). The courts in these cases find no reason in law or social policy why a bank cannot make the facility available on those terms and conditions mutually agreed upon.

In Pennsylvania, however, the rule has developed, albeit somewhat obscurely, that the bailor-bailee relationship is one in which the law will protect the former party from attempts by the latter to exculpate himself from the consequences of his own negligence. *See, e.g., Atkins v. Racquet Garage Corp.*, 177 Pa. Superior Ct. 94, 110 A.2d 767 (1955) ("A bailee cannot stipulate against liability for his own negligence.") This rule is particularly applicable here because neither party disputes that the relationship created by the use of the Night Depository was one of bailment. Not only does the contract itself identify the relationship as a bailment, but also the characteristics of the relationship compel the law to reach the same conclusion. In *Bernstein v. Northwestern Nat'l Bank,* supra, the only Pennsylvania case involving a night depository service, this Court held that the relationship between the bank and the customer in the use of the night depository service was one of bailment reciprocally beneficial to both parties; and the same relationship exists in this case. *See Smalich v. Westfall,* 440 Pa. 409, 269 A.2d 476 (1970) (A bailment is the delivery of personalty for the accomplishment of some purpose upon a contract) ; *Sparrow v. Airport Parking Co.,* 221 Pa. Superior Ct. 32, 289 A.2d 87 (1972) (A bailment is the delivery of goods in trust upon a contract).

In *Downs v. Sley System Garages,* 129 Pa. Superior Ct. 68, 69, 194 A. 772, 773 (1937), we stated the "well-

recognized rule . . . that a bailee cannot relieve himself of a liability for his own negligence." *See also Wendt v. Sley System Garages,* 124 Pa. Superior Ct. 224, 188 A. 624 (1936). Because the bailment relationship existed in this case, the Bank would be precluded from using the exculpatory provision as a shield from liability for lack of due care.

We, however, will not rest our decision upon so thin a reed because we find a much stronger foundation in the bank-customer relationship and the public policy which encircles it and similar relationships.

Generally, a written contract defines the extent of the obligations of contracting parties, *Miller v. Weller,* 288 F.2d 438 (3d Cir.), *cert denied,* 368 U.S. 829 (1961), and a valid exculpatory clause will preclude recovery. *Jamison v. Ellwood Consol. Water Co.,* 420 F.2d 787 (3d Cir. 1970). It was recognized long ago that parties may contractually absolve themselves from liability for the consequences of their negligent acts. *Maving v. Todd,* 4 Camp. 225, 171 Eng. Rep. 72 (1815) ; *see, e.g., Dilks v. Flohr Chevrolet,* 411 Pa. 425, 192 A.2d 682 (1963) ("the validity of a contractual provision which exculpates a person from liability for his own acts of negligence is well settled") ; *Commonwealth v. Monumental Properties, Inc.,* 10 Pa. Commonwealth Ct. 596, 314 A.2d 333 (1973).

However, the law also recognized that lying behind these contracts is a residuum of public policy which is antagonistic to carte blanche exculpation from liability, *e.g., Employers Liab. Assur. Corp. v. Greenville Business Men's Ass'n,* 423 Pa. 288, 224 A.2d 620 (1966) ; *Crew v. The Bradstreet Co.,* 134 Pa. 161, 19 A. 500 (1890) ; and thus developed the rule that these provisions would be strictly construed with every intendment against the party seeking their protection. *See, e.g., Kotwasinski v. Rasner,* 436 Pa. 32, 258 A.2d 865 (1969).; *Neville Chem. Co. v. Union Carbide Corp.,*

422 F.2d 1205 (3d Cir.), *cert. denied,* 400 U.S. 826 (1970); Restatement (Second) of Torts, §496 B, comment d at 566-67 (1965). Responding to changes in economic and social necessities, courts then went beyond this rule of construction and found that in certain situations and relations express agreements by which one party assumes the risk of another's conduct could not, in good conscience, be accepted. Where a disparity of bargaining power has grown out of economic necessity for certain goods or services or from a monopolistic position of a seller, courts have found exculpatory agreements inimical to the public interest. Where an agreement does not represent a free choice on the part of the plaintiff, where he is forced to accept the clause by the necessities of his situation, courts have refused to enforce such agreements as contrary to public policy. This rule has been applied broadly in the employer-employee relationship, *e.g., Tarbell v. Rutland R. Co.,* 73 Vt. 347, 51 A. 6 (1901); in situations where one party is charged with a duty of public service, *e.g., Denver Consol. Elec. Co. v. Lawrence,* 31 Colo. 301, 73 P. 39 (1903), *Bowman & Bull Co. v. Postal Telegraph-Cable Co.,* 290 Ill. 155, 124 N.E. 851 (1919), *cert. denied,* 251 U.S. 562 (1920) (public utilities); *Boston & Maine R. Co. v. Piper,* 246 U.S. 439 (1918), *Turek v. Pa. R.R. Co.,* 361 Pa. 512, 64 A.2d 779 (1949) (common carriers); *Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co.,* 372 U.S. 697 (1963); *Bisso v. Inland Waterways Corp.,* 349 U.S. 85 (1955) (carriers); *Tunkl v. Regents of U. of Calif.,* 60 Cal.2d 92, 383 P.2d 441, 32 Cal. Rptr. 33 (1963) (hospitals); *Northwest Airlines, Inc. v. Alaska Airlines, Inc.,* 351 F.2d 253 (9th Cir. 1965), *cert. denied,* 383 U.S. 936 (1966) (airports); to agreements which attempt to exculpate one from liability for the violation of a statute or regulation designed to protect human life, *Boyd v. Smith,* 372 Pa. 306, 94 A.2d 44 (1953);

*Warren City Lines, Inc. v. United Refining Co.,* 220 Pa. Superior Ct. 308, 287 A.2d 149 (1971) ; and elsewhere, *e.g.,* Uniform Commercial Code §2-719 (3), 12A P.S. §2-719, provides that the limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable. *See generally* Restatement (Second) of Torts, §496 B, comments a-j (1965) ; Restatement of Contracts, §575 (1932) ; W. Prosser, The Law of Torts, §68, at 442-45 (4th ed. 1971).

Those instances in which courts refuse to enforce exculpatory clauses fall beyond the sphere of agreements "between persons relating entirely to their private affairs" *Dilks v. Flohr Chevrolet,* supra at 434, 192 A.2d at 687, *cf. K & C, Inc. v. Westinghouse Elec. Corp.,* 437 Pa. 303, 263 A.2d 390 (1970) ; *Wedner v. Fidelity Security Systems, Inc.,* 228 Pa. Superior Ct. 67, 307 A.2d 429 (1973)[3] and involve that disproportionate bargaining power which locks one party in a precarious position at the mercy of the other's negligence. *Henningsen v. Bloomfield Motors, Inc.,* 32 N.J. 358, 161 A.2d 69 (1960).[4]

---

[3] The rule permitting exculpation from liability for negligent conduct assumes an arm's length bargained-for agreement. *See Galligan v. Arovitch,* 421 Pa. 301, 219 A.2d 463 (1966) ; *cf. Southwest Forest Indus., Inc. v. Westinghouse Elec. Corp.,* 422 F.2d 1013 (9th Cir.), *cert. denied,* 400 U.S. 902 (1970) (applying Pennsylvania law).

[4] *Cf. Elderkin v. Gaster,* 447 Pa. 118, 288 A.2d 771 (1972) (sale of new home accompanied by implied warranty of habitability) ; *Hoffman v. Misericordia Hospital,* 439 Pa. 501, 267 A.2d 867 (1970) (implied warranty of fitness accompanies blood transfusion) ; *Kassab v. Central Soya,* 432 Pa. 217, 246 A.2d 848 (1968) (abolishing vertical privity requirement in breach of warranty actions) ; *Reitmeyer v. Sprecher,* 431 Pa. 284, 243 A.2d 395 (1968) (recognizing responsibility of landlord for injury to tenant resulting from certain defects in the premises) ; *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966) (adopting strict liability in tort for vendor of defective products).

In Pennsylvania, both the courts and the legislature have implicitly agreed that the public necessity for banking services belies the concept that the bank-customer relationship is one of equal parties evenly bargaining. "Banks, like common carriers, utility companies, etc., perform an important public service. The United States Government and the Commonwealth respectively stipulate how banks under their respective jurisdictions shall be incorporated and organized. All banks are examined and supervised by government or state officers with extreme particularity. The United States insures deposits in banks up to a stipulated amount. If a person desires to deposit money in a bank, necessarily, he is relegated to a governmental or state regulated banking institution. The situation of a depositor is quite analogous to that of a passenger on a public carrier who is required to accept such means of transportation and to purchase a ticket in the nature of a contract. This Court has consistently decided that it is against public policy to permit a common carrier to limit its liability for its own negligence. . . ." *Thomas v. First Nat'l Bank,* 376 Pa. 181, 185-86, 101 A.2d 910, 912 (1954) (citations omitted); *see Wedner v. Fidelity Security Systems, Inc.,* supra. Section 4-103 of the Uniform Commercial Code, 12A P.S. §4-103, prevents a bank from disclaiming or limiting its liability for lack of good faith or failure to exercise ordinary care in connection with bank deposits and collections.[5]

We, therefore, conclude that we must reject the reasoning of those courts which have found agreements similar to the one hereunder consideration not to be inimical to the public interest; and hold that a bank cannot contractually exculpate itself from the conse-

---

[5] The section permits parties by agreement to set standards for measuring ordinary care so long as the standards are not "manifestly unreasonable;" but no such standards were set in the agreement before us.

quences of its own negligence or lack of good faith in the performance of any of its banking functions. We find the public need for professional and competent banking services too great and the legitimate and justifiable reliance upon the integrity and safety of financial institutions too strong to permit a bank to contract away its liability for its failure to provide the service and protections its customers justifiably expect, that is, for its failure to exercise due care and good faith. The Bank, while acting as a bailee, was also acting in its capacity as a bank. The Bank undertook to provide the Night Depository Service from utilitarian, not altruistic motives. The service was conducive to continued growth and prosperity; and represented one of many "banking services." Although the parties could delay the initiation of the normal depositor-creditor relationship, they could not erase the relationship of bank-customer. As we have stated above, we hold that a bank, irrespective of contractual attempts at exculpation, continues to owe its customers a duty of due care and good faith.

## II

In view of our holding that the exculpatory provisions are invalid as a matter of law, we must now determine whether the court correctly granted the motion for summary judgment. We hold that it did not. "A summary judgment is to be entered only in the clearest of cases where there is not the slightest doubt as to the absence of a triable issue of material fact." *Granthum v. Textile Machine Works,* 230 Pa. Superior Ct. 199, 201-202, 326 A.2d 449, 451 (1974); *Prince v. Pavoni,* 225 Pa. Superior Ct. 286, 302 A.2d 452 (1973). Although the complaint does not allege negligence on the part of the Bank, it does allege that the Bank received the funds and refused to credit the account of the ap-

pellant, in breach of a contract to credit when received; and it alleges a conversion of those funds. Therefore, an issue of fact is raised as to whether the funds were in fact received. The clause by which the Bank attempted to "conclusively bind" the appellant to the report of the employee of the Bank who opened the safe is exculpatory in nature because it attempts to operate irrespective of the due care and good faith of the Bank. It is, therefore, under our holding in Section I of this opinion, inoperable to that extent. Where a genuine issue of material fact exists summary judgment is improper. *Kotwasinski v. Rasner,* supra; *Ritmanich v. Jonnel Enterprises, Inc.,* 219 Pa. Superior Ct. 198, 280 A.2d 570 (1971); *McFadden v. American Oil Co.,* 215 Pa. Superior Ct. 44, 257 A.2d 283 (1969).

Judgment reversed with a procedendo.

VAN DER VOORT, J., concurs in the result.